679 A.2d 96

STATE ADMINISTRATIVE BOARD OF ELECTION LAWS

v.

BOARD OF SUPERVISORS OF ELECTIONS
OF BALTIMORE CITY.

No. 28, Sept. Term, 1995.

Court of Appeals of Maryland.

Order Filed June 16, 1995.

Opinion Issued July 24, 1996.

588

John R. Greiber, Jr. (Council, Baradel, Kosmerl & Nolan, P.A., on brief), Annapolis, for petitioner.

Ralph S. Tyler, Deputy Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Lawrence P. Fletcher–Hill, Asst. Atty. Gen., Baltimore, Sharon B. Benzil, Asst. Atty. Gen., Annapolis, on brief), for appellee.

## PER CURIAM ORDER

For reasons to be stated in an opinion later to be filed, it is this 16th day of June, 1995

ORDERED, by the Court of Appeals of Maryland, that the judgment of the Circuit Court for Baltimore City be, and it is hereby, affirmed, with costs. The mandate shall issue forthwith.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

ELDRIDGE, Judge.

The dispute in this case is between the Baltimore City Board of Supervisors of Elections and the State Administrative Board of Election Laws. The controversy, which arose shortly before the 1995 Baltimore City mayoral election, concerned the failure of the Baltimore City Election Board to conduct a purge of inactive voters from its registration rolls. In an action for a declaratory judgment and other relief, the Circuit Court for Baltimore City entered a judgment in favor of the Baltimore City Election Board, and the State Board appealed. This Court granted the State Board's petition for a writ of certiorari and motion for an expedited hearing. After briefing and oral argument, we issued an order on June 16, 1995, affirming the circuit court's judgment. We now set forth the reasons for our order.

### I.

Prior to January 1, 1995, Maryland Code (1957, 1993 Repl. Vol.), Art. 33, § 3–20, required local election boards to remove

annually from voter registration rolls the names of registered voters who had not voted "at least once at a primary, general or special election within the five preceding calendar years." [1] Former § 3–20(b) stated that once a voter was removed from the registration rolls for failing to vote within the last five years, that person could not vote until he or she registered again.

The General Assembly of Maryland in 1994, however, repealed § 3–20 and enacted Code (1957, 1993 Repl.Vol., 1995 Supp.), Art. 33, § 17A, effective January 1, 1995. Pursuant to this new statute, a registered voter's name may be removed from the registration rolls only at the request of the registrant, by reason of a criminal conviction or a guardianship for

---

1. Art. 33, § 3–20, provided as follows:

"**§ 3–20. Cancellation of registration for failure to vote.**

(a)(1) If a registered voter has been registered but has not voted at least once at a primary, general or special election within the five preceding calendar years, it shall be the duty of the board, unless cause to the contrary be shown, to cause the registration of that voter to be cancelled by removing the registration cards or forms of the voter from the original and duplicate files and placing them in a transfer file. Voting in any municipal election during this period will satisfy the requirements of this section, if voter registration for the municipal election is conducted by the board for the county in which the municipality is located and if the municipality promptly furnished a listing of all voters casting votes in that election. A notice of this action and the reason therefor shall be sent to the last known address of the voter, notifying him to appear before the board at a date specified in the notice not earlier than one week or later than two weeks from the date of mailing of the notice, and to show cause why his name should not be removed from the registry.

(2) Lists containing the names and last known street addresses of those voters whose registration is to be cancelled shall be made available on request 30 days prior to the date of removal. Any board may charge reasonable fees for 30 days prior to the date of removal. Any board may charge reasonable fees for such lists but the rate may not exceed ½ cent per name and address.

(b) A voter whose registration has been cancelled under this section shall not thereafter be eligible to vote except by registering again as in this article provided.

(c) Annually the board shall determine which persons have not voted at least once at a primary, general, or special election within the five calendar years immediately preceding January 1 of the current year and send those persons the notice required in subsection (a) of this section. The notice shall be in a form prescribed by the State Administrative Board of Election Laws."

mental disability as provided by State law, on a determination that the registrant has died, or upon a change of address.[2] Removal because of the failure to vote within the preceding five years is no longer authorized by statute.[3]

In early 1995, a dispute arose between the Baltimore City Election Board and the State Election Board regarding the failure of the local Board to conduct a purge in 1994 of those voters who had not voted in elections during the preceding five years. This omission by the Baltimore City Board, however, was not discovered until January 1995, after the repeal of the Art. 33, § 3–20. On January 31, 1995, the Attorney General of Maryland advised both election boards that the Baltimore City Board could not lawfully conduct a purge in 1995 because the authority for that action had been repealed. Despite the 1995 repeal of § 3–20 and the Attorney General's opinion, the State Board on March 29, 1995, ordered that the

---

**2.** Art. 33, § 3–17A, states in pertinent part as follows:

"**§ 3–17A. Removal from voter roll.**

(a) When removal allowed.—A registered voter's name shall be removed from the voter roll only under the following circumstances:

(1) At the request of the registrant;

(2) As provided by State law, by reason of criminal conviction, or guardianship for mental disability;

(3) Upon a determination under § 3–18 of this subtitle that a registrant has died; or

(4) Subject to the provisions of subsection (b), a change in residence."

\* \* \* \* \* \*

**3.** The impetus for the change in the Maryland Election Code was the enactment by Congress of the National Voter Registration Act of 1993. This federal law generally requires that a state, in addition to its own voter registration methods, provide for voter registration in federal elections through driver's license applications and renewals, through mail-in registration forms, or through voter registration agencies. In addition, the federal law prohibits any state procedure that "result[s] in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote." 42 U.S.C. § 1973gg–6(b)(2). In order to conform to the federal statute, the General Assembly of Maryland enacted § 3–17A to comply with the federal law, and, at the same time, made § 3–17A applicable to state, county, and Baltimore City elections. *See* Ch. 370 of the Acts of 1994.

Baltimore City Board conduct a purge of inactive voters.[4]

In response to the State Board's order, the Baltimore City Board decided to institute a voter verification mail program pursuant to the newly enacted Art. 33, § 3–17A. Section 3–17A(b) authorizes a local election board to conduct by mail a verification program aimed at removing the names of voters who have become ineligible to vote in the district where they are registered because they have moved outside of the district. In order for the program to be executed, however, a local election board must obtain approval from the State Board. *See* Code (1957, 1993 Repl.Vol., 1995 Supp.), Art. 33, § 3–17A(b)(2). In the present case, the State Board rejected the Baltimore City Board's proposal.

After the State Board's rejection of the proposed voter verification program, the Baltimore City Board, represented by the Attorney General, filed on May 3, 1995, in the Circuit Court for Baltimore City, a complaint for a declaratory judgment and other relief. The plaintiff also filed motions for summary judgment and to expedite the proceedings. Specifically, the Baltimore City Board requested that the State Board's purge order be declared unlawful in light of the change in the law, and that the State Board be ordered to approve the local Board's alternative proposal to verify the eligibility of Baltimore City registrants.

At the conclusion of a hearing on May 23, 1995, the circuit court granted the local Board's motion for summary judgment and entered a judgment declaring that the March 29, 1995, order of the State Board, directing the Baltimore City Board to conduct a purge, was unlawful because the authority to conduct such purge had been repealed. The court further ordered the State Board to approve the local Board's proposed mail verification program. In an opinion delivered at the conclusion of the hearing, the circuit court explained:

---

**4.** According to the State Board, 33,864 persons on the City's voter rolls as of December 31, 1994, were "purge eligible" for failing to vote in the previous five years.

"The Court has concluded that to order that the voters that haven't voted in the last five years be stricken from the voter registration rolls of Baltimore City could be violative of ... Article 33, § 3–17A, and the fact that the city election board failed in its duty to make that purge when it was allowed to make that purge does not deprive the voters of Baltimore City, including or particularly those who haven't voted in the last five years, of voting in the municipal election in September and November of 1995. There is nothing in the law that I can find that would allow the punishment of the voters for the sins of the [local election] board."

The State Board immediately noted an appeal to the Court of Special Appeals and thereafter filed in this Court a petition for a writ of certiorari and a motion for expedited consideration.[5] As previously indicated, we granted the certiorari petition and the motion for expedited consideration. After receiving briefs and hearing oral argument, we affirmed the circuit court's judgment.

## II.

The State Board contends that the failure of the Baltimore City Board to purge from the voter registration rolls the names of all voters who had not voted between January 1, 1989, and December 31, 1993, must be "corrected" by undertaking such purge after January 1, 1995, even though the statutory authority to conduct a purge was repealed effective January 1, 1995. The State Board argues that, because the local Board's omission occurred in 1994, the applicable statutory provision is former Art. 33, § 3–20, which was in effect in 1994. According to the State Board, to apply the new statute,

---

**5.** In addition, the State Board filed a motion to stay the enforcement of the circuit court judgment. This motion was denied. The State Board's certiorari petition challenged only that portion of the circuit court's judgment declaring that the State Board's order of March 29, 1995, was unlawful.

Art. 33, § 3–17A, would be giving it "retrospective application." (Appellant's brief at 11).

Furthermore, the State Board maintains that the Baltimore City registered voters who had failed to vote for five years prior to 1994, and who, therefore, should have been purged, are not "eligible voters." (Appellant's brief at 16). The State Board asserts that the voter registration rolls containing the names of the inactive voters are inaccurate.

■ Lastly, the State Board argues that, since inactive registered voters in the counties were presumably purged and were required to reregister, Baltimore City registered voters who were inactive during the same period should not be allowed to vote without having had to suffer a purge and to reregister. The State Board maintains that this alleged inequality of treatment between Baltimore City residents and county residents violates both the Equal Protection Clause of the Fourteenth Amendment and the equal protection principle embodied in Article 24 of the Maryland Declaration of Rights.[6] In addition, the State Board asserts that this different treatment is inconsistent with Article I, § 2, of the Maryland Constitution, providing "for a uniform Registration of the names of all the voters in this State...."[7] In the view of the

---

6. Article 24 of the Maryland Declaration of Rights states:

 **"Article 24. Due process.**
 That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

 Although Article 24 does not contain an express equal protection clause, nevertheless the concept of equal protection is embodied in the Article. *See Gilchrist v. State,* 340 Md. 606, 623 n. 3, 667 A.2d 876, 884 n. 3 (1995); *Ashton v. Brown,* 339 Md. 70, 101 n. 17, 660 A.2d 447, 462 n. 17 (1995); *Maryland Aggregates v. State,* 337 Md. 658, 671 n. 8, 655 A.2d 886, 893 n. 8, *cert. denied,* —— U.S. ——, 115 S.Ct. 1965, 131 L.Ed.2d 856 (1995); *Verzi v. Baltimore County,* 333 Md. 411, 417, 635 A.2d 967, 969–970 (1994), and cases there cited.

7. Article I, § 2, of the Constitution of Maryland states as follows:

 **"Section 2. Registration of voters.**
 The General Assembly shall provide by law for a uniform Registration of the names of all the voters in this State, who possess the

State Board, equal protection and uniformity principles are infringed by granting "the right to vote" to "[c]itizens in Baltimore City who were inactive," but denying the same right to "[c]itizens in all jurisdictions other than Baltimore City who failed to vote during the period specified" (Appellant's brief at 14). The State Board relies on cases which, on equal protection grounds, invalidated statutes applying additional voting qualifications to some citizens but not to others. *See Kramer v. Union Free School District*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *O.C. Taxpayers for Equal Rights, Inc. v. Mayor and City Council of Ocean City*, 280 Md. 585, 375 A.2d 541 (1977).

The Baltimore City Board, in addition to disagreeing with the State Board's position on the merits, argues that the State Board "has no standing ... [to] assert the alleged equal protection rights of" the individual citizens "whose rights to equal protection have supposedly been violated by the City Board's failure to do the purge." (Appellee's brief at 16). The local Board invokes the general principle that a litigant is not entitled to assert someone else's right to equal protection of the laws.

### III.

■ Before turning to the merits of the controversy, we shall address the Baltimore City Board's argument that the

---

qualifications prescribed in this Article, which Registration shall be conclusive evidence to the Judges of Election of the right of every person, thus registered, to vote at any election thereafter held in this State; but no person shall vote, at any election, Federal or State, hereafter to be held in this State, or at any municipal election in the City of Baltimore, unless his name appears in the list of registered voters; the names of all persons shall be added to the list of qualified voters by the officers of Registration, who have the qualifications prescribed in the first section of this Article, and who are not disqualified under the provisions of the second and third sections thereof."

The State Board's "uniformity" argument under Article 1, § 2, is the same as its equal protection argument. Consequently, we shall not discuss them separately in this opinion.

State Board lacks standing to assert the equal protection rights of individual Maryland citizens with regard to voting.

■ Of course, "the general rule is that a person may only assert his own constitutional rights or immunities." *Clark v. State*, 284 Md. 260, 264, 396 A.2d 243, 246, *cert. denied*, 444 U.S. 858, 100 S.Ct. 119, 62 L.Ed.2d 77 (1979) (equal protection challenge to the statute punishing escapes from penal institutions). Nevertheless, the principle that one person is ordinarily not entitled to assert someone else's right to equal protection of the laws does have exceptions. *See, e.g.,* the discussion in *Powers v. Ohio*, 499 U.S. 400, 410–415, 111 S.Ct. 1364, 1370–1373, 113 L.Ed.2d 411, 425–428 (1991), and cases there cited.

■ Moreover, under the Maryland law of standing, when a litigant has an independent basis for standing to challenge the validity of particular governmental action or inaction, under some circumstances the challenge may include the contention that the governmental action is unconstitutionally discriminatory, even though the challenger is not the person or entity being discriminated against. *See State v. Burning Tree Club, Inc.*, 315 Md. 254, 290–293, 554 A.2d 366, 371–373, *cert. denied*, 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989).

■ In addition, the Legislature may confer a status, powers, or duties upon an official or agency which, in appropriate situations, enables that official or agency to assert the interests or rights of others. *See, e.g., Public Service Comm'n v. Md. People's Counsel*, 309 Md. 1, 6–10, 522 A.2d 369, 371–373 (1987). In light of the powers and duties conferred upon the State Board by the General Assembly, we believe that the State Board had standing to raise the equal protection and uniformity issues in the context of this case.

The General Assembly, in Art. 33, § 1A–1(e), has broadly provided that "[t]he State Administrative Board of Election Laws shall have the following powers and duties, including but not limited to: (1) Exercising supervision over the conduct of elections in the State. . . ." Subsection (2) of the same section authorizes the State Board to adopt rules and regulations "to

facilitate compliance by the [local] boards of supervisors of elections with the requirements of this article in the conduct of registrations, voting and elections in the State...." The remaining subsections of § 1A–1(e), as well as numerous other provisions of the Election Code, more specifically set forth the State Board's supervisory authority with regard to voter registration, approval of "Voting Systems," voting, absentee ballots, recounts, election records, etc.

Under Art. 33, § 1A–1(f), the State Board is required to hold meetings with the members of the local boards, and "[i]t is mandatory for those members of the [local] boards, substitute members, the principal administrative officers of the boards and the counsel for the boards who are designated by the State Administrative Board to attend...." The section goes on to state: "The purpose of the meetings is to instruct the members of the boards, designated employees and counsel as to their duties in the conduct of elections."

Consequently, the supervisory authority of the State Board over the local boards is pervasive. If local boards are engaging in acts or omissions in the conduct of voter registration which violate the legal rights of Maryland citizens possessing the qualifications to vote, the State Board clearly has the authority to issue to the local boards lawful orders that will correct the problem. Furthermore, when the propriety of such an order by the State Board is challenged in court, the State Board can certainly defend the order on the ground that the local board's action or omission resulted in denying legal rights to Maryland citizens.

In the context of this case, therefore, the State Board had standing to raise the equal protection and uniformity issues.

IV.

Although the State Board has standing to make the arguments which it advances, those arguments must fail. The order issued to the Baltimore City Board was clearly not a lawful order; it directly contradicted the applicable statutory scheme. Moreover, there is no merit to the State Board's

attempt to justify its order by contending that the local Board's application of Art. 33, § 3–17A is improperly "retrospective," that the inactive Baltimore City registrants were not "eligible" to vote, and that equal protection principles were infringed.

### A.

■ The State Board's assertions that § 3–17A was "retrospectively" applied by the local Board, that the "inactive" Baltimore City registrants were not "eligible" voters, and that the local Board's failure to purge them implicates the fundamental right to vote for purposes of equal protection analysis, seem to be premised upon the theory that being an active or frequent voter was a qualification for voting in 1994. This premise underlying the State Board's position, however, is flatly erroneous. Being a frequent voter was not, and could not have been, a qualification for voting in 1994.

■ The qualifications for voting in Maryland are prescribed in Article I, §§ 1 and 4, of the Maryland Constitution.[8] In order to vote, one must be a citizen of the United States, eighteen years of age or older, and a resident of Maryland. In addition, the General Assembly may regulate or prohibit

---

8. Article I, §§ 1 and 4 of the Constitution of Maryland provide as follows:

"**Section 1. Elections to be by ballot; qualifications of voters; election districts.**

All elections shall be by ballot. Every citizen of the United States, of the age of 18 years or upwards, who is a resident of the State as of the time for the closing of registration next preceding the election, shall be entitled to vote in the ward or election district in which he resides at all elections to be held in this State. A person once entitled to vote in any election district, shall be entitled to vote there until he shall have acquired a residence in another election district or ward in this State."

 \* \* \* \* \* \*

"**Section 4. Right to vote of persons convicted of certain crimes and persons under guardianship.**

The General Assembly by law may regulate or prohibit the right to vote of a person convicted of infamous or other serious crime or under care or guardianship for mental disability."

the right to vote of one convicted of a serious crime or under care or guardianship for mental disability. These prerequisites are the exclusive qualifications for voting in Maryland. *See* Article 7 of the Maryland Declaration of Rights ("every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage"); *Jackson v. Norris,* 173 Md. 579, 594, 195 A. 576, 584 (1937); *Kemp v. Owens,* 76 Md. 235, 24 A. 606 (1892). *See also Board v. Goodsell,* 284 Md. 279, 283, 396 A.2d 1033, 1035 (1979). Moreover, the General Assembly may neither expand nor curtail the qualifications necessary to vote. *See, e.g., Langhammer v. Munter,* 80 Md. 518, 527, 31 A. 300, 301–302 (1895) ("But whatever may be done, no restrictions can be imposed that will require other or different qualifications for voting, than those prescribed by the first Article of the Constitution of the State"); *Southerland v. Norris,* 74 Md. 326, 328, 22 A. 137, 137 (1891) ("These qualifications [for voting in Maryland], fixed by the organic law, can neither be enlarged nor curtailed by the General Assembly").

Consequently, having voted frequently in the past is not a qualification for voting and, under the Maryland Constitution, could not be a qualification. The "inactive" voters who remained on the registration rolls and who continued to meet the constitutional qualifications for voting in Baltimore City, were not "ineligible" voters.

■ Contrary to the position of the State Board, former Art. 33, § 3–20, did not make voting at least once every five years a condition for continued voter eligibility. Instead, the sole purpose of former § 3–20, as well as present § 3–17A, was to set forth a procedure or remedy by which election boards could remove from the voter registration rolls the names of persons who had died, moved away, or incurred a voting disability under Article I, § 4, of the Constitution. *See Hoffman v. State of Md.,* 928 F.2d 646, 649 (4th Cir.1991). The repeal of § 3–20 and the enactment of § 3–17A in its place effected no change in the qualifications for voting or in any other substantive right. Instead, the General Assembly

simply decided upon a more narrowly tailored remedy to prevent unqualified persons from voting.[9]

## B.

■ Turning specifically to the legality of the State Board's order in this case, it is clear that the order was unlawful. As of January 1, 1995, and thereafter, no statutory authority existed for the purge ordered by the State Board. The former legal basis for a purge, Art. 33, § 3–20, had been repealed. New § 3–17A, enacted in its place, set forth the "only" circumstances under which registered voters' names could be removed from the voter rolls, and a "purge" of inactive voters was not one of those circumstances. Section 3–17A was the statute in effect when the State Board issued its order on March 29, 1995, and the order was in violation of that statute.

The State Board's order to purge inactive voters also was unlawful under Art. 33, § 3–3, which states as follows:

"**§ 3–3. Registration to be permanent.**

"A person registered on June 1, 1957, or at any time thereafter as a qualified voter in the City of Baltimore or in any county shall not be required to register again unless such registration shall be cancelled as hereinafter provided."

At the time of the State Board's order, a purge of inactive registrants was not a method of registration cancellation "as hereinafter provided."

---

9. Although the issue was not raised in this case, is not now before us, and is unlikely to be raised in the future in light of the repeal of Art. 33, § 3–20, the breadth of that former statute might well have presented a substantial issue concerning its validity under Article I, § 2, of the Maryland Constitution. *See* note 7, *supra.* The Attorney General's office, during the oral argument in the present case, expressed the view that former § 3–20 was probably in violation of Article I, § 2. Although the United States Court of Appeals for the Fourth Circuit upheld the constitutionality, under the federal constitution, of former § 3–20 in *Hoffman v. State of Md.,* 928 F.2d 646 (4th Cir.1991), no issue was raised in that case regarding the statute's validity under Article I of the Maryland Constitution.

Moreover, utilizing in the spring of 1995 the voter verification method authorized by Art. 33, § 3–17A, was in no sense an improper "retrospective" application of that statute. Section 3–17A, by its terms, applied to voter verification procedures to be employed by election boards from and after the effective date of the statute, which was January 1, 1995.

▮▮ As discussed in Part A above, both former § 3–20 and present § 3–17A are statutes setting forth remedial procedures enabling election boards to remove from the voter registration rolls the names of persons who have died, moved away, or incurred a voting disability. The repeal of § 3–20 and the enactment of § 3–17A changed no substantive rights. A change in procedure or in a remedy, whether administrative or judicial, which does not modify substantive rights, is ordinarily applied to pending matters as well as to all remedial actions taking place after the effective date of the change. *See, e.g., Roth v. Dimensions,* 332 Md. 627, 636–638, 632 A.2d 1170, 1174–1175 (1993); *Starfish Condo. v. Yorkridge Serv.,* 295 Md. 693, 705, 458 A.2d 805, 811 (1983); *Mraz v. County Comm'rs of Cecil Co.,* 291 Md. 81, 90, 433 A.2d 771, 776–777 (1981); *Aviles v. Eshelman Elec. Corp.,* 281 Md. 529, 533, 379 A.2d 1227, 1229 (1977) ("Absent a contrary intent made manifest by the enacting authority, any change made by statute ... affecting a remedy only (and consequently not impinging on substantive rights) controls all ... actions whether accrued, pending or future").

### C.

Finally, the Board's order of March 29, 1995, cannot be justified on an equal protection or uniformity theory. Neither former § 3–20 nor present § 3–17A, on their face, authorize different treatment of persons similarly situated.

▮▮ The failure by Baltimore City administrative election officials in 1994 to comply with the statute then applicable, thereby resulting in different treatment of certain persons, does not itself amount to a constitutional violation under equal protection or uniformity principles. The Supreme Court's

opinion in *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944), is directly on point. In *Snowden,* state election officials, acting in violation of state law, failed to include the petitioner's name among the successful candidates in the proclamation of primary election results and in issuing certificates of nomination to the successful candidates. Consequently, petitioner asserted that he was deprived of nomination and election as a representative in the state legislature, and he sought damages for an alleged violation of his Fourteenth Amendment right to equal protection of the laws. In rejecting the equal protection claim, Chief Justice Stone explained for the Court (321 U.S. at 8, 64 S.Ct. at 401, 88 L.Ed. at 502–503):

> "But not every denial of a right conferred by state law involves a denial of the equal protection of the laws, even though the denial of the right to one person may operate to confer it on another. Where, as here, a statute requires official action discriminating between a successful and an unsuccessful candidate, the required action is not a denial of equal protection since the distinction between the successful and unsuccessful candidate is based on a permissible classification. And where the official action purports to be in conformity to the statutory classification, an erroneous or mistaken performance of the statutory duty, although a violation of the statute, is not without more a denial of the equal protection of the laws.

> "The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination."

Thus, the mere fact that Baltimore City election officials failed to apply former § 3–20 in 1994 does not, without more, amount to a constitutional violation.

 Furthermore, even if it be assumed, *arguendo,* that the local election officials' actions in 1994 created an inequality among Maryland citizens in that year which may have violated

constitutional equal protection principles, the State Board's order of March 29, 1995, would not have been an appropriate remedy. As pointed out by the circuit court, those citizens of Baltimore City who were qualified and registered voters in 1995, and who could lawfully be removed from the registration rolls only in accordance with new § 3–17A, should not be punished in 1995, in violation of the Election Code, simply because of an omission by the election officials in 1994. Any violation of state law by election officials, and any resulting violation of equal protection principles, had ceased as of January 1, 1995. The same alleged equal protection violation could not occur in the future because of the statutory changes. Under the circumstances, there was no occasion for any form of prospective or other equitable-type relief. *See Green v. Mansour*, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985).

The circuit court, therefore, correctly invalidated the State Board's order of March 29, 1995.