761 A.2d 324

Jeremy R. FRANKEL

v.

BOARD OF REGENTS OF the UNIVERSITY
OF MARYLAND SYSTEM, et al.

No. 26, Sept. Term, 1999.

Court of Appeals of Maryland.

Nov. 6, 2000.

300

David J. Frankel, Washington, DC, for Petitioner.

Mark J. Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Md., on brief), Baltimore, for Respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

ELDRIDGE, Judge.

The University of Maryland, College Park, a State-owned and operated institution of higher education, requires that students classified with "out-of-state status" pay higher tuition fees than students classified with "in-state status." Pursuant to the University's tuition policy, students who are "financially independent" are eligible for in-state status upon a showing of "permanent residence" in Maryland. Students who are "financially dependent" upon an out-of-state benefactor, however, are ineligible for in-state status. The issue in this case is whether the University's policy violates the due process and equal protection rights of bona fide Maryland residents who are financially dependent upon an out-of-state source of funds.

I.

The University of Maryland, College Park, is part of the University System of Maryland. The University System of Maryland is "an independent unit of State government" established "[i]n order to foster the development of a consolidated system of public higher education" in Maryland. Maryland Code (1978, 1999 Repl.Vol.), §§ 12–101(a), 12–102(a)(3) of the Education Article. The University System, which is "a body corporate and politic," is governed by the Board of Regents. § 12–102(a), (b). As a governing body, the Board is empowered to "make rules and regulations, and prescribe policies and procedures, for the management, maintenance, operation, and control of the University System." § 12–104(j). Pursuant

to § 12–109(a) of the Education Article, the Board must also appoint a president for each of the eleven "constituent institutions" within the University System.[1] In turn, the president of each institution has the authority, subject to the regulations and policies of the Board, to "[s]et tuition and fees." § 12–109(e)(7).

In August 1990, the Board of Regents approved the "Policy for Student Residency Classification for Admission, Tuition and Charge Differential Purposes" (the Policy). The Policy is used by the constituent institutions which have established tuition "charge differentials" based on state residency in order to determine which applicants are, in fact, bona fide state residents. The University of Maryland, College Park, is one of the institutions which has established tuition charge differentials between "in-state" and "out-of-state" students in accordance with the Policy.

Under the Policy, a student's "residency classification" is initially dependent upon the source of his or her financial support. A student who is "financially independent" is given the opportunity to prove bona fide state residence based on eight traditional domicile factors, set forth in Part I, subpart A of the Policy, such as place of residence, voter registration, property ownership, the state to which income taxes are paid, driver's license, motor vehicle registration, etc. *See, e.g., Stevenson v. Steele,* 352 Md. 60, 69–70, 720 A.2d 1176, 1180–1181 (1998); *Blount v. Boston,* 351 Md. 360, 365–373, 718 A.2d

---

1. The eleven "constituent institutions" which are "under the jurisdiction of the Board of Regents" are as follows (Maryland Code (1978, 1999 Repl.Vol.) § 12 101(b)(4)):

"(i) University of Maryland, Baltimore;
(ii) University of Maryland, Baltimore County;
(iii) University of Maryland, College Park;
(iv) University of Maryland Eastern Shore;
(v) University of Maryland University College;
(vi) Bowie State University;
(vii) Coppin State College;
(viii) Frostburg State University;
(ix) Salisbury State University;
(x) Towson University; and
(xi) University of Baltimore."

1111, 1113–1117 (1998), and cases there cited; *Toll v. Moreno*, 284 Md. 425, 438–444, 397 A.2d 1009, 1015–1019 (1979). A student who is "financially dependent," however, is precluded from presenting evidence relating to his or her own permanent residence. Instead, the permanent residence of the financially dependent student is deemed to be the same as that of the individual or individuals who provide the monetary support. A "financially dependent student" is defined under the Policy as either

> "one who is claimed as a dependent for tax purposes, or [one] who receives more than one-half of his or her support from a parent, legal guardian, or spouse during the twelve (12) month period immediately prior to the last published date for registration for the semester or session."

A "financially independent student," on the other hand, is one who is not a dependent for tax purposes, receives less than one-half his or her support "from any other person or persons," and "demonstrates that he or she provides through self-support one-half or more of his or her total expenses."[2] In addition, there is a twelve-month durational residency requirement, meaning that the financially independent student, or in the case of a financially dependent student, the parent, legal guardian, or spouse, "must have resided in Maryland for at least twelve (12) consecutive months" prior to the last date of registration for the forthcoming semester in order to qualify for in-state status.

---

2. There is an apparent discrepancy in the Policy between the definitions of "financially dependent" and "financially independent." Although a financially dependent student is one "who receives more than one-half of his or her support from a *parent, legal guardian, or spouse*," a financially independent student is one who receives less than one-half of his or her support "from *any other person* or persons." (Emphasis added). Despite the discrepancy, the record discloses that a student who cannot prove financial independence, as defined in the Policy, will automatically be deemed financially dependent. Thus, a student who receives one-half or more of his or her support from any other person or persons, regardless of whether such persons are parents, legal guardians, or a spouse, will be deemed financially dependent and will be deemed to have the residence of such other persons.

Under the "Procedures Established by the University of Maryland at College Park," which are contained in Part II of the Policy, residency is first determined when a student applies for admission. If a student is dissatisfied with the initial residency classification, or if circumstances subsequently change, he or she "may request a re-evaluation of his or her residency status." If the request for re-evaluation is denied, the student may appeal to the Director of the "Residency Classification Office," and finally to the "Residency Review Committee." While a request for re-evaluation and the appeals are pending, a student is "still obligated to pay the out-of-state tuition." The Policy goes on to provide that "[i]f an approval is granted, then the Bursar's Office will credit the student's account for any excess tuition paid. The student may also request a refund directly from the Bursar's Office."

## II.

The petitioner, Jeremy Frankel, was born in Annapolis, Maryland, in 1977. He grew up in Montgomery County, Maryland, where he lived until September 1991. At that time, his mother, who was divorced from his father, remarried and moved to Rhode Island, and Jeremy went with her, "against [his] will." Three years later, in September 1994, Jeremy moved back to Maryland alone and enrolled at the University of Maryland, College Park. He lived year-round in College Park for the four years he was attending the University. He was a registered Maryland voter; he was employed part-time and paid income taxes to the State of Maryland, and he had a Maryland driver's license. Although the record is unclear as to the degree to which Jeremy was supported by his parents during this time, it is undisputed that over one-half of his expenses were paid through a bank account at the NASA Federal Credit Union, in Maryland, which Jeremy owned with his parents.

When Jeremy applied for admission to the University in December 1993, before he had moved back to Maryland, he did not seek resident status for tuition purposes. He listed his residence as that of his father, in the District of Columbia.

Consequently, he and his parents paid the higher out-of-state tuition. After his second year at the University, however, Jeremy submitted an application for in-state status to begin in the Fall 1996 semester. Although Jeremy claimed that he was a financially independent permanent resident, his application for reclassification was denied. On appeal to the "Residency Classification Office," he was told that in-state status had been denied because he failed to show that "he financed through self-support one-half or more of his total expenses." Jeremy was classified as a financially dependent student, and, because his parents lived out-of-state, he was deemed a nonresident. Finally, Jeremy appealed to the "Residency Review Committee," submitting bank statements, copies of income tax returns, driver's license, and voter's registration card. His appeal was denied on January 29, 1997.

After Jeremy had exhausted his administrative appeals within the University System, he and his father, David Frankel, filed in the Circuit Court for Montgomery County a complaint for a declaratory judgment and other relief. The Frankels named the Board of Regents and the President of the University of Maryland, College Park (hereinafter collectively referred to as "the Board") as defendants. In the complaint, the Frankels asked the Circuit Court to declare that: (1) Jeremy was entitled to in-state tuition under the Policy because he was "financially independent" as defined therein, or (2) the Policy's nonresidency presumption, based on financial dependency, was in violation of Jeremy's rights to due process and equal protection of the laws and thus was unconstitutional. The Board filed a motion to dismiss or for summary judgment, and the Frankels filed a cross-motion for summary judgment.

After a hearing on the motions, the Circuit Court granted summary judgment in favor of the Board and filed a declaratory judgment holding that the decision to classify Jeremy as financially dependent was "not arbitrary and capricious, illegal, or unreasonable." The court declared that the Policy did not violate due process principles and did not violate Jeremy's right to equal protection of the law because the distinction

"between a financially independent student whose residence is considered for in-state status, and a financially dependent student whose residence is not considered, is certainly a distinction that has a rational basis."

The Frankels appealed to the Court of Special Appeals which, in an unreported opinion, affirmed the judgment of the Circuit Court. Jeremy Frankel then filed a petition for a writ of certiorari which this Court granted. *Frankel v. Univ. of Maryland,* 354 Md. 112, 729 A.2d 404 (1999). Shortly thereafter, the Board filed a motion to dismiss. This Court deferred action on the motion.

## III.

In the motion to dismiss, the Board argued that the case became moot once Jeremy graduated from the University of Maryland, College Park, in May 1998. The Board made the same argument before the Court of Special Appeals, which had held that the University's "refusal to grant Jeremy in-state status is a live controversy to the extent that he may now be entitled to an excess tuition refund." Although we shall reverse the judgment of the Court of Special Appeals on the merits, we agree with its holding on the issue of mootness. There remains a justiciable controversy between Jeremy Frankel and the Board.

In the Frankels' initial complaint, they requested, *inter alia,* that the Circuit Court declare that they were entitled to a refund for "the difference between the amount [they had] paid for tuition and the amount that would have been paid for tuition based on in-state status." Thereafter, in their amended complaint, they simply requested "[a]n award of any other and further relief that the court considers proper."

Despite the broad request for relief in the Frankels' amended complaint, the Board argues that the petitioner in the amended complaint "abandoned his claim to a tuition refund," and that, as a result, there is no justiciable controversy between the parties. The Board contends that Jeremy was required to abandon the claim for a refund because it was

barred by sovereign immunity and that, because he has graduated, he cannot claim that his rights will be violated in the future. Consequently, the Board's argument continues, even if this Court were to hold that the Policy was unconstitutional, the right to a refund could be enforced only through "a yet-to-be-filed contract action," which would be barred by the one year statute of limitations set forth in Code (1984, 1999 Repl.Vol.), § 12–202 of the State Government Article. According to the Board's argument, "sovereign immunity bars the Frankels' retrospective claims and mootness bars their prospective claims."

■ Contrary to the Board's position, we do not believe that the wording change in the amended complaint, from a request for a declaration concerning a refund to a request for "other and further relief that the court considers proper," constituted an abandonment of a claim for a refund. If a declaration concerning a refund were appropriate at this stage of the controversy, it would be encompassed by the language of the amended complaint.

Moreover, the matter of a refund is not being raised too late, as contended by the Board. Instead, any decision concerning the grant of Jeremy's refund claim would seem to be premature. Under the Policy and the procedures therein set forth, a student is obligated to pay the higher out-of-state tuition during the pendency of a request for re-evaluation and all appeals. Until there is a proper re-evaluation, approval of the request, and a change in status, there would appear to be no entitlement to a credit or a refund. If, as we shall hold, the Policy provided for, and the administrative officials used, legally impermissible criteria in denying Jeremy's request for in-state status and claim for a refund, those officials will be obligated to reconsider his request and claim using permissible criteria. A refund under the Policy cannot be made until the appropriate officials properly rule upon Jeremy's request for in-state status, employing legally permissible criteria.

In addition, nothing in the Policy provides that the entitlement to a refund ceases immediately upon the student's graduation. The alternative provisions in the Policy for a

credit to the student's account or a refund suggest that a refund is the appropriate remedy when the student is no longer enrolled at the University and thus no longer has an account with the University which can be credited. Furthermore, "the General Assembly has now provided broad ... refund remedies covering every type of tax, fee, or charge improperly collected by a Maryland governmental entity." *Bowman v. Goad,* 348 Md. 199, 204, 703 A.2d 144, 146 (1997). Although one must follow the appropriate administrative remedy to be entitled to a refund, *Bowman v. Goad, supra,* 348 Md. at 204, 703 A.2d at 146, Jeremy has meticulously followed the applicable administrative procedures required by the University.

Finally, there is no merit in the suggestion that Jeremy's claim is barred by governmental immunity. Even if the only basis for the claim were the general waiver of governmental immunity in contract actions set forth in Code (1984, 1999 Repl.Vol.), §§ 12–201 through 12–204 of the State Government Article, Jeremy's claim would not be barred by the one year period of limitations in § 12–202. Jeremy filed this action within a year from the final administrative decision denying his request for in-state status and his claim for a refund. As previously discussed, he did not abandon his claim for a refund.

There are, moreover, grounds for Jeremy's claim other than §§ 12–201 through 12–204 of the State Government Article. It may be that Code (1988, 1997 Repl.Vol., 1999 Supp.), § 13–901(a) of the Tax General Article, is applicable when a state college or university charges a student more for tuition than is legally payable. That section broadly authorizes a refund claim against the State by a claimant who "(1) erroneously pays to the State a greater amount of ... fee, [or] charge ... than is properly and legally payable." Under § 13–1104(a), a claimant has three years from the date of payment to file "a claim for refund under this article ...," and Jeremy clearly filed his claim and brought this action within that time.

If the statutory refund remedy in §§ 13–901(a)(1) and 13–1104(a) of the Tax General Article is inapplicable to this case,

the result would be no different. The General Assembly delegated to the Board very broad authority over tuition and fees (§ 12–109(e)(7) of the Education Article), and the Board adopted a Policy and regulations entitling a student to a credit or refund of tuition upon re-classification from out-of-state status to in-state status. It has long been settled in Maryland that when one pays to a state government agency or a local government more in taxes, fees, or charges than the government is entitled to, and when the law specifically authorizes "a refund, although no particular statutory remedy is provided," a common law contract "action . . . is available." *Apostol v. Anne Arundel County*, 288 Md. 667, 672, 421 A.2d 582, 585 (1980); *See, e.g., White v. Prince George's Co.*, 282 Md. 641, 653–654 n. 7, 387 A.2d 260, 267 n. 7 (1978) (where the law "provided that the [claimant] was entitled to a refund but did not contain a special statutory remedy, . . . an action in assumpsit could be maintained"); *Baltimore v. Household Finance Corp.*, 168 Md. 13, 14, 176 A. 480, 481 (1935) (a law, providing that one who paid "more money for taxes or other charges than was properly and legally chargeable" was entitled to a refund, "changed the common law rule that taxes [or other charges] paid under a mistake of law could not be recovered," and therefore the plaintiff could bring an action in assumpsit, subject to the statute which "provides that suits in assumpsit shall be commenced within three years after the cause of action accrued"); *Baltimore v. Home Credit Co.*, 165 Md. 57, 65, 166 A. 604, 607–608 (1933) (same); *George's Creek Coal & Iron Co. v. County Com'rs of Allegany County*, 59 Md. 255, 260–261 (1883) (same).

 Apart from the general waiver of governmental immunity for contract actions in §§ 12–201 through 12–204 of the State Government Article, and the law concerning refunds of overpayments to governmental agencies, the General Assembly has authorized the Board to "[s]ue and be sued . . . ." Code (1978, 1999 Repl.Vol.), § 12–104(b)(3) of the Education Article. Although a "sue and be sued" provision ordinarily does " 'not alone constitute a general waiver of [governmental] immuni-

ty,'" it does waive immunity in actions concerning matters within the scope of the governmental agency's "'duties and obligations.'" *Jackson v. Housing Opportunities Comm'n,* 289 Md. 118, 124, 422 A.2d 376, 379 (1980), quoting *Board of Trustees of Howard Community College v. John K. Ruff, Inc.,* 278 Md. 580, 590, 366 A.2d 360, 366 (1976), and *Katz v. Washington Suburban Sanitary Comm'n,* 284 Md. 503, 512, 397 A.2d 1027, 1033 (1979). *See O & B, Inc. v. Maryland-Nat'l Capital Park & Planning Com'n,* 279 Md. 459, 466–468, 369 A.2d 553, 557–558 (1977); *Weddle v. School Commissioners,* 94 Md. 334, 51 A. 289 (1902). The Board has a duty to "prescribe policies and procedures" for the University System, and, in order to carry out that power and "accomplish the purposes of the University," the Board was granted the authority to "[e]nter into contracts of any kind." § 12–104(b)(5) and (j) of the Education Article. As earlier mentioned, the Board is expressly granted the authority to set "tuition and fees." § 12–109(e)(7) of the Education Article. Although the Board's waiver of governmental immunity for actions filed in tort may be limited "to the extent of any applicable liability insurance," the waiver of immunity for other actions is not so limited. *See* § 12–104(b) and (i) of the Education Article. Under all of the circumstances, the statutory authorization to "be sued" waives any governmental immunity in declaratory judgment and contract actions to recover tuition overcharges which the Board might otherwise have enjoyed.

Accordingly, we reject the Board's argument that this case should be dismissed.

### IV.

### A.

Turning to the merits of the case, the petitioner argues that the Board's definitions of and use of "financial dependence" and "financial independence" in the determination of residency violate his rights to due process and equal protection under both the United States and the Maryland Constitutions. Jeremy points out that, under the Policy, the financially dependent

student's residency will always be based upon the residency of those from whom he or she receives monetary support, without exception. Whereas the intentions and actions of a financially independent student are relevant to his or her residency classification, those of the financially dependent student are entirely irrelevant. In fact, the Board will not even look at the various domicile factors listed in the Policy, such as voter registration, etc., unless the student can first prove "financial independence" as defined in the Policy. Therefore, Jeremy contends, the Policy unconstitutionally presumes that adult students who are financially supported by out-of-state sources are nonresidents. This presumption, Jeremy argues, violates due process because it is irrebutable. *See Vlandis v. Kline,* 412 U.S. 441, 450, 93 S.Ct. 2230, 2235, 37 L.Ed.2d 63, 70 (1973) (irrebutable presumption of nonresidency for University tuition purposes, based on an out-of-state address at time of application, is "so arbitrary as to constitute a denial of due process of law").

In addition, Jeremy contends that the Board's reliance upon the source of monetary support creates an irrational classification in violation of the equal protection rights of students who are bona fide Maryland residents, even though they are financially dependent upon out-of-state sources. Jeremy states (petitioner's brief at 10):

> "The Classification Policy's purpose is to limit in-state tuition to *bona fide* State residents. Financial dependency—whether it is on out-of-state parents, or an out-of-state bank for that matter—sheds no light on a person's choice of permanent residence. It is arbitrary, therefore, for Respondents to rely on financial dependency as a discriminating factor, let alone the sole discriminating factor in determining a person's residence."

Jeremy concludes by asserting that the "Policy denies due process and equal protection; it discriminates on the basis of wealth[;] it penalizes travel, ... and it is over-broad." *Id.* at 11.

The Board responds by contending that financial dependency is highly relevant to a determination of residency. The

State has a legitimate interest in allocating the substantial benefit of lower tuition rates to Maryland residents, the Board argues, and in a determination of in-state status for tuition purposes, financial dependency on out-of-state sources is "far more probative" than other, more common, residency factors, such as where one votes and files income tax returns. (Respondents' brief at 11). In addition, the Board argues that the presumption of nonresidency under the Policy, is, in fact, rebuttable. If Jeremy had established financial independence, the Board contends, he, like many other students applying for reclassification, would have been granted in-state status. Finally, the Board claims that the Policy does not violate equal protection principles because the "Policy easily passes the minimal test of a rational basis for the distinction between a financially independent and a dependent student." (Respondents' brief at 13).

■ We need not in this case reach the petitioner's due process arguments and his equal protection argument based on the Fourteenth Amendment to the United States Constitution. In our view, the Policy's and the Board's absolute preclusion of in-state tuition status for any student whose primary monetary support comes from an out-of-state source, arbitrarily and irrationally discriminates against many bona fide Maryland residents in violation of the equal protection component of Article 24 of the Maryland Declaration of Rights.

## B.

■ Article 24 of the Maryland Declaration of Rights states as follows:

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

"Although Article 24 does not contain an express equal protection clause, the concept of equal protection nevertheless is

embodied in the Article." *Renko v. McLean,* 346 Md. 464, 482, 697 A.2d 468, 477 (1997). *See, e.g., State Admin. Bd. of Election Laws v. Board of Supervisors,* 342 Md. 586, 594 n. 6, 679 A.2d 96, 100 n. 6 (1996); *Gilchrist v. State,* 340 Md. 606, 623 n. 3, 667 A.2d 876, 884 n. 3 (1995); *Ashton v. Brown,* 339 Md. 70, 101 n. 17, 660 A.2d 447, 462 n. 17 (1995); *Maryland Aggregates v. State,* 337 Md. 658, 671–672 n. 8, 655 A.2d 886, 893 n. 8, *cert. denied,* 514 U.S. 1111, 115 S.Ct. 1965, 131 L.Ed.2d 856 (1995); *Verzi v. Baltimore County,* 333 Md. 411, 417, 635 A.2d 967, 969–970 (1994), and cases there cited.

 Moreover, while United States Supreme Court cases applying the Equal Protection Clause of the Fourteenth Amendment are, of course, binding upon us in the application of that federal constitutional provision, and are regarded as persuasive in the application of Article 24 of the Declaration of Rights, nevertheless the "federal and state guarantees of equal protection are 'obviously independent and capable of divergent application. . . .' " *Maryland Aggregates v. State, supra,* 337 Md. at 672 n. 8, 655 A.2d at 893 n. 8, quoting *Murphy v. Edmonds,* 325 Md. 342, 354, 601 A.2d 102, 108 (1992). *See Verzi v. Baltimore County, supra,* 333 Md. at 417, 635 A.2d at 970 ("We have consistently recognized that the federal Equal Protection Clause and the Article 24 guarantee of equal protection of the laws are complementary but independent, and 'a discriminatory classification may be an unconstitutional breach of the equal protection doctrine under the authority of Article 24 alone,' " quoting *Attorney General v. Waldron,* 289 Md. 683, 715, 426 A.2d 929, 947 (1981)); *Kirsch v. Prince George's County,* 331 Md. 89, 97, 626 A.2d 372, 376, *cert. denied,* 510 U.S. 1011, 114 S.Ct. 600, 126 L.Ed.2d 565 (1993) ("the two provisions [the Fourteenth Amendment's Equal Protection Clause and Article 24] are independent of one another, and a violation of one is not necessarily a violation of the other").[3]

---

**3.** By underscoring the independence of Article 24 of the Declaration of Rights, we do not suggest that the result in this case would be any

Under the provisions of the Board's Policy, as reaffirmed during oral argument before this Court, a student at the University of Maryland, College Park, cannot have in-state tuition status if more than one-half of the student's financial support comes from a person or persons who live out-of-state. This requirement is absolute and has no exceptions. Furthermore, as emphasized by the Board at oral argument before us, the relationship between the student and the out-of-state benefactor is immaterial. Although in the present case the benefactor may be an out-of-state parent, the out-of-state monetary source could be a grandparent, a distant relative, a family friend, or any other out-of-state benefactor, and the student will still be deemed a nonresident. A student who is a Maryland resident under any legal meaning or ordinary usage of the term "resident," but whose chief source of monetary support is someone out-of-state, will, under the Policy, be deemed a nonresident of Maryland and will be required to pay a greater tuition than other Marylanders. Therefore the Policy, *inter alia,* places in one class bona fide Maryland residents whose primary source of funds is within the State, and places in another, higher paying class, bona fide Maryland residents whose primary source of funds is outside the State.

The Board argues that the above-described classification "is not based on a suspect class" and does "not impair fundamental rights." (Respondents' brief at 13). Thus, the Board's argument continues, the classification is "presumed to be constitutional," is subject to the "minimal test of a rational basis," and "easily passes" that test. (*Ibid.*). The petitioner suggests that the classification does infringe upon fundamental rights and therefore is subject to a higher degree of scrutiny. Alternatively, the petitioner maintains that the classification

different if the sole issue were whether the Policy violated the Equal Protection Clause of the Fourteenth Amendment. · We simply are making it clear that our decision is based exclusively upon Article 24 and is in no way dependent upon the federal constitutional provision. *See Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983); *Perry v. State,* 357 Md. 37, 86 n. 11, 741 A.2d 1162, 1188 n. 11 (1999).

"has no rational basis" and "is unconstitutionally irrational." (Petitioner's brief at 10). We shall assume that the Policy's classification based upon the source of funds is subject to the rational basis test. Nevertheless, as previously indicated, it fails that test.

Even under the "minimal" rational basis test, "this Court has not hesitated to strike down discriminatory economic regulation that lacked any reasonable justification," *Maryland Aggregates v. State, supra,* 337 Md. at 673, 655 A.2d at 894. As pointed out in *Maryland Aggregates,* 337 Md. at 672 n. 9, 655 A.2d at 893 n. 9, such invalid regulations have often "imposed economic burdens, in a manner tending to favor [some Maryland] residents ... over [other Maryland] residents...."

Thus, in *Verzi v. Baltimore County, supra,* 333 Md. 411, 635 A.2d 967, applying the rational basis test, we invalidated, under the equal protection component of Article 24, a Baltimore County regulation imposing a "location requirement" for licensed tow truck operators who are called by the police to tow vehicles which have become disabled. Under the regulation, whenever police in Baltimore County were requested to call a tow truck operator for a disabled vehicle, the police were required to call upon an operator whose place of business was located in Baltimore County. In discussing the equal protection component of Article 24, Judge Karwacki stated for the Court in *Verzi* (333 Md. at 419, 635 A.2d at 971):

"We ... have not hesitated to carefully examine a statute and declare it invalid if we cannot discern a rational basis for its enactment. 'The vitality of this State's equal protection doctrine is demonstrated by our decisions which, although applying the deferential standard embodied in the rational basis test, have nevertheless invalidated many legislative classifications which impinged on privileges cherished by our citizens.' *Attorney General v. Waldron, supra,* 289 Md. at 715, 426 A.2d at 947. Although we have traditionally accorded legislative determinations a strong presumption of constitutionality, *Murphy v. Edmonds,* 325 Md. at 356, 601 A.2d at 114; *Briscoe v. Prince George's Health Dep't,* 323

Md. 439, 448, 593 A.2d 1109, 1113 (1991), we have also required that a legislative classification rest upon 'some ground of difference having a fair and substantial relation to the object of the legislation.' *State Bd. of Barber Examiners v. Kuhn*, 270 Md. 496, 507, 312 A.2d 216, 222 (1973)."

After reviewing several prior decisions of this Court invalidating discriminations among Maryland residents because of geographical factors, the Court in *Verzi* continued (333 Md. at 423, 635 A.2d at 973):

"In areas of economic regulation, as we have discussed, this Court has been particularly distrustful of classifications which are based solely on geography, i.e., treating residents of one county or city differently from residents of the remainder of the State."

A regulation treating bona fide Maryland residents differently based "solely" on the geographical origin of their monetary support is not dissimilar to the geographically based regulations which were invalidated in *Verzi* and other cases. *See, e.g., Bruce v. Dir., Chesapeake Bay Affairs*, 261 Md. 585, 276 A.2d 200 (1971) (invalidating, on equal protection grounds, regulations restricting commercial crabbing and oystering in a county's waters to residents of that county); *Md. Coal & Realty Co. v. Bureau of Mines*, 193 Md. 627, 642–643, 69 A.2d 471, 477 (1949) (geographical discrimination with regard to strip mining invalidated); *Dasch v. Jackson*, 170 Md. 251, 269–270, 183 A. 534, 542 (1936) (territorial classification for licensing and regulating paperhangers held to lack a rational basis); *Havre de Grace v. Johnson*, 143 Md. 601, 123 A. 65 (1923) (the Court invalidated a municipal ordinance which prohibited non-residents of the municipality from operating an automobile for hire within the municipality). *See also Kirsch v. Prince George's County, supra*, 331 Md. 89, 626 A.2d 372 (zoning ordinance, imposing more strenuous requirements upon residential property rented to university students than on residential property rented to non-students was held to lack a rational basis and thus was invalid under Article 24); *Wheeler v. State*, 281 Md. 593, 380 A.2d 1052 (1977).

■ As set forth in several of the above-cited cases, a governmental regulation placing a greater burden on some Marylanders than on others based on geographical factors must "rest upon 'some ground of difference having a fair and substantial relation to the object of the'" regulation. *Verzi v. Baltimore County, supra,* 333 Md. at 419, 635 A.2d at 971. The stated object of the Board's Policy is to allow bona fide Maryland residents to pay a lower tuition than nonresidents. According to the Board, its "intent [is] to allocate" the "benefit of lower tuition rates . . . to Maryland residents." (Respondents' brief at 13). The Board insists that whether one receives his or her primary monetary support from persons inside of the State or from out-of-state is "probative" of his or her permanent residence. (*Id.* at 11).

As the petitioner does not challenge the objective of according a reduced tuition benefit to bona fide Maryland residents, we shall assume that the Board's objective is entirely legitimate. Nevertheless, the Board's absolute preclusion of resident status for any student whose primary source of monetary support resides out-of-state has no "fair and substantial relation to" the Board's and Policy's objective. On the contrary, many applications of the Policy will be inconsistent with the objective of providing a tuition benefit to bona fide Maryland residents.

For example, a student may have been born and raised in Maryland, may never have left the State, and may have lived with both of his parents in Maryland. If, shortly before applying to the University of Maryland, the student's parents divorced, if the student continued to reside with one parent in Maryland, and if the other parent moved to another state but agreed to provide the monetary support while the student attended the University of Maryland, the student would be required to pay the higher nonresident tuition.

Similarly, if a student and his or her parents lived together in Maryland, never left the State, voted in Maryland, paid Maryland income and property taxes, etc., but if the student's expenses while attending college were provided by a grand-

parent who lived in New York, the student would be deemed a nonresident under the Policy.

The above-described hypothetical situations, as well as many other hypothetical situations involving bona fide Maryland residents with out-of-state monetary support while attending college, were discussed at oral argument before this Court. In every one of these situations, the Board insisted that, under the Policy, the student would have to be treated as a nonresident for tuition purposes. It is obvious that the Policy has little relation to the stated objective of benefitting bona fide Maryland residents.

■■■ Consequently, the Board's and the Policy's use of "financial dependence" and "financial independence" creates an arbitrary and irrational classification which violates the equal protection principle embodied in Article 24 of the Maryland Declaration of Rights. The petitioner is entitled to have his residency classification determined by the University based on the eight "domicile" criteria set forth in Part I, subpart A, of the Policy, and without using the "financial dependence" and "financial independence" factors.[4]

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS CONSIS-*

---

4. Our holding in this case does not necessarily preclude the Board in the future from adopting a regulation or amending the Policy to make the source of a student's financial support a factor, among the other eight listed criteria, in determining whether a student is a bona fide resident of Maryland. There is a substantial difference between an absolute requirement and a mere factor which should be weighed and considered along with other factors. Moreover, in determining legal residence or domicile, the weight that is given any particular factor may vary depending upon the circumstances. *See Blount v. Boston,* 351 Md. 360, 370, 718 A.2d 1111, 1116 (1998) ("Although ... domicile is a unitary concept and the same legal principles apply regardless of the context, ... nonetheless the importance or weight to be given some factors or contacts will vary depending upon the circumstances").

*TENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENTS.*