971 A.2d 214

ANNE ARUNDEL COUNTY, Maryland

v.

HALLE DEVELOPMENT, INC., et al.

No. 59, Sept. Term, 2008.

Court of Appeals of Maryland.

May 6, 2009.

Reconsideration Denied June 11, 2009.

540

Kurt J. Fischer (Marta D. Harting, and Melissa L. Mack-iewicz, DLA Piper US LLP, Baltimore; Jonathan Hodgson,

County Atty., and Andrew Murray, Senior Asst. County Atty., Annapolis), on brief, for Petitioner.

John R. Greiber, Jr. (Law Offices of Greiber & Scheibe, Millersville), on brief, for Respondents.

Argued Before BELL, C.J., HARRELL, BATTAGLIA, ADKINS, BARBERA, JOHN C. ELDRIDGE * (Retired, Specially Assigned) and ALAN M. WILNER (Retired, Specially Assigned), JJ.

ADKINS, Judge.

The respondents in this appeal, Halle Development, Inc., et al., are representative plaintiffs in a class action of current property owners ("the Owners") that seek to recover development impact fees collected by Anne Arundel County, Maryland ("the County"), petitioner, for the fiscal years 1988 through 1996. The Circuit Court determined that because (1) $4,719,359 in impact fees [1] collected from property owners were not thereafter timely paid or encumbered for capital improvements within the applicable district, and (2) the period to make capital improvements was not properly extended, the Owners were entitled to refunds. The County appeals a judgment permitting the respondents to proceed with a class action to obtain a refund of fees that the County did not expend or encumber by the end of the sixth fiscal year following collection. We shall affirm the judgment below, concluding that a class action is a proper means for the Owners' claims.

### The County Impact Fee Ordinance

The County is authorized to levy fees under Anne Arundel County Code ("AACC"), Article 17, Title 11, Section 203, which states: "Any person who improves real property and

---

* Eldridge, J., participated in the hearing and conference of this case, but recused himself prior to the adoption of this opinion.

1. The Circuit Court ruled that the County must also pay five percent interest per annum on the amount to be refunded to each current owner, running from the date each impact fee was originally paid.

thereby causes an impact upon public schools, transportation, or public safety facilities shall pay development impact fees[.]"[2] The amount of the fee varies according to the land use and is computed by reference to a fee schedule. *See* AACC § 17–11–204.

The stated purpose for the impact fees is to promote the health, safety, and general welfare of County residents by

(1) requiring all new development to pay its proportionate fair share of the costs for land, capital facilities, and other expenses necessary to accommodate development impacts on public school, transportation, and public safety facilities;

(2) complementing the provisions of Title 5 by requiring that all new development pay its share of costs for reasonably attributable impacts; and

(3) helping to implement the General Development Plan to help ensure that adequate public facilities for schools, transportation, and public safety are available in a timely and well planned manner.

AACC § 17–11–202.[3]

There are separate special funds for transportation impact fees and for school impact fees. AACC § 17–11–208. Collected impact fees are to be deposited "in the appropriate special fund to ensure that the fees and all interest accruing to the special fund are designated for improvements reasonably attributable to new development and are expended to reasonably benefit the new development." *Id.* Under Section 17–

---

**2.** The Anne Arundel County impact fee ordinance at issue was previously codified under Anne Arundel County Code ("AACC"), Article 24, Title 7. In this opinion, we refer to the ordinance by its re-codification.

**3.** Impact fees serve as an additional source of revenue for municipalities to pay for the infrastructure to support new development. Paul A. Tiburzi, *Impact Fees in Maryland,* 17 U. Balt. L.Rev. 502 (1988). "Impact fees have two essential features: (1) they shift the cost of capital improvements from all users or taxpayers in the jurisdiction to the new residents who create the need for them, and (2) they are collected before the improvements are constructed rather than after they are in service." *Id.* at 502–03.

11–209(c), the County is divided into school impact fee districts and transportation impact fee districts by way of maps prepared by the Office of Planning and Zoning ("PZO") and adopted by the County Council. Section 17–11–209(d) states that collected development impact fees "shall be used for capital improvements within the development impact fee district from which they are collected, so as to reasonably benefit the property against which the fees were charged."

The principal impact fee ordinance provision at issue in this appeal is Section 17–11–210 which governs impact fee refunds. It provides in pertinent part:

(a) **Notice of refund availability.** If fees collected in any district during a fiscal year *have not been expended or encumbered by the end of the sixth fiscal year following collection,* the Office of Finance shall give notice of the availability of a refund of the fees and refund the fees as provided in this section.

(b) **Publication of notice.** Within 60 days from the end of a fiscal year during which fees become available for refund, the Controller shall cause to be published once a week for two successive weeks in one or more newspapers that have a general circulation in the County, a notice that development impact fees collected within a particular district for a preceding fiscal year are available for refund on application by the current owner of the property for which the fee was originally paid. The notice shall set forth the time and manner for making application for the refund.

(c) **Refund application deadline.** An eligible property owner shall file an application for a refund within 60 days of the last publication of notice. On proper application and demonstration that the fee was paid, the Controller shall refund the fees to the property owner with interest at the rate of 5% per year.

(d) **Refund on pro rata basis.** If only a portion of the fees collected in a district during a fiscal year have been expended or encumbered, the portion not expended or encumbered shall be made available for refund on a pro rata

basis to property owners. Each eligible property owner who has properly applied for a refund shall receive a refund in an amount equal to the portion of the original fee that was not expended or encumbered.

(e) **Extension.** The Planning and Zoning Officer may extend for up to three years the date at which the funds must be *expended or encumbered* under subsection (a). An extension shall be made only on a *written finding* that within a three-year period certain capital improvements are planned to be constructed that will be of *direct benefit to the property* against which the fees were charged.

AACC § 17–11–210 (emphasis added).

### The County's Extensions

The County began collecting impact fees in fiscal year 1988. The County's fiscal year runs from July 1 through June 30. Beginning in 1994, the County PZO purported to grant several three-year extensions to the period in which the County was required to expend or encumber collected impact fees as provided in Section 17–11–210(e). The County purported to effectuate the first extension in the following March 21, 1994 inter-office correspondence from the County's director of planning and code enforcement, entitled "Extension of Time to Use Impact Fees[,]" to the County's financial officer:

We have determined that impact fees collected in Road Districts 2 and 4 will not be expended or encumbered within the sixth year following collections, as required in [Section 17–11–210(a) ].

In accordance with Section [ 17–11–210(e) ] I hereby extend use of funds collected in 1988 and 1989 for three years beyond the sixth year requirement.

Capital projects in district 2 (Solley Road) and district 4 (Md 170 Odenton Junction) (Towncenter to MD 175) and (Towncenter to Reece) (Patuxent Conway Road) are programmed and are expected to be constructed as capital projects. These projects are identified in the FY94 and proposed FY95 capital program.

The County issued extension decisions in 1996, 1997, 2001, 2002, and 2003 by way of interoffice memoranda in a format substantially the same as the correspondence above. The County now concedes that the extension decisions all failed to (1) identify the properties that would be directly benefitted by the planned improvements and (2) comply with the Section 17–11–210(e) limitation that extensions be granted only to expend or encumber fees paid with respect to these properties. It is also undisputed that the County did not advertise that any refunds were available, because it considered the extensions effective at the time they were made.

## The Proceedings Below

The Owners filed a class action in the Circuit Court for Anne Arundel County in February of 2001 on behalf of representative plaintiffs and others who are "current owners of real property located within the boundaries of Anne Arundel County ... who have been deprived of refunds for 'developers impact fees[.]' "[1] The Owners alleged three causes of action: the County's failure to refund the fees (1) constituted an unconstitutional taking under the Fifth and Fourteenth Amendments, (2) violated the Owners rights under the Article 24 of the Maryland Declaration of Rights, and (3) unjustly enriched the County, creating the basis for a constructive trust.[5]

### The Dismissal And First Appeal

On July 26, 2001, the Circuit Court dismissed the Owners' complaint for failing to exhaust administrative remedies provided in Maryland Code (1957, 2001 Repl.Vol.), Article 24,

---

4. The representative plaintiffs are Halle Development, Inc., Anthony and Sandra Dale, Kevin and Robin Butler, and William Strong. They are successor representative plaintiffs to Cambridge Commons, the initial plaintiff, which sold its property during the pendency of the suit.

5. The Court of Special Appeals, in an August 21, 2002 unreported opinion, determined that the Owners, in their unjust enrichment-constructive trust count, effectively pled an action in assumpsit. The Circuit Court and Court of Special Appeals thereafter treated the Owners' third count as such a claim.

Sections 9–710 through 9–713 for actions involving county tax refunds. The Owners appealed ("Appeal I") and the Court of Special Appeals ("COSA"), in an August 21, 2002 unreported opinion, reversed. The intermediate appellate court held that there were no express or implied administrative remedies for the Owners to exhaust. It observed that there is no provision in the county code to compel the refund of fees absent an advertisement and that the Article 24 remedy for tax refund claims was unavailable because the Owners' claims could not ripen until at least six years have passed since collection. The court noted that Article 24, Section 9–724 required that refund claims be made within three years from the date the tax was paid. The COSA then ruled, citing *Apostol v. Anne Arundel County*, 288 Md. 667, 672, 421 A.2d 582 (1980) and *Frankel v. Bd. of Regents*, 361 Md. 298, 309, 761 A.2d 324 (2000), that the Owners could maintain an action in assumpsit because there is a statutory provision providing for a refund, but no particular statutory remedy for obtaining a refund unless the County publishes a refund notice.

### *Class Certification, A Statute Of Limitations Challenge, A Request For Remand, And A Second Appeal*

Finding that the case satisfied all of the Maryland Rule 2–231 criteria, the Circuit Court conditionally certified it as a class action on February 26, 2003. On October 23, 2003, the Circuit Court ruled on cross-motions for summary judgment. The County argued that the Owners' assumpsit claims for fees collected in FYs 1988 through 1991 were barred by the three-year statute of limitations in Md.Code (1974, 2006 Repl.Vol., 2008 Supp.), Section 5–101 of the Courts and Judicial Proceedings Article ("CJP"). The County maintained that the Owners, by filing suit in February 2001, did not meet the standard for reasonably prudent investigation because the " 'information as to the [impact fee ordinance's] revenues and expenditures are public records[.]' " The court disagreed with the County's inquiry notice argument, finding that "it exceeds a 'reasonable person' standard to require that taxpayers initiate public records requests promptly whenever a statutory dead-

line approaches that might entitle them to a refund." The court considered this particularly true in light of an evidentiary presumption that officials perform their duties with regularity and the impact fee ordinance's requirement that the County provide public notice of refundable fees. It then concluded that "[i]n the absence of any other evidence proffered which would have put [the Owners] on notice, [it] will deny the motion for summary judgment on this limitations basis." The Circuit Court, on December 8, 2003, ruled on one of the County's extension decisions and concluded that it was ineffective because the PZO failed to make explicit reference to any specific property that would be directly benefitted by the planned capital improvement. In the wake of this decision which, by implication, rendered invalid the County's other extension decisions, the County filed another motion to dismiss, requesting that the court remand the case to the PZO for new extension decisions under the correct legal standard.

Relying on *Frankel,* the County contended that dismissal was warranted because the Owners' assumpsit claim was premature until the PZO rendered administrative decisions under the correct standard. The Circuit Court denied the County's motion on October 4, 2004, concluding (1) that the COSA had already decided in the first appeal that the impact fee ordinance did not provide an administrative remedy and that an action in assumpsit was available and (2) that the Owners became vested with a contingent property right to receive a refund under the statute when the County failed to timely and effectively extend the time for expending or encumbering the collected fees.

On December 30, 2004, the Circuit Court ordered the County to identify the members of the class for the purpose of providing notice as required by Maryland Rule 2–231(e). By its order, the court rejected the County's request that it be permitted to advertise belatedly by publication the availability of impact fee refunds as contemplated by AACC, Section 17–11–210(b). The County argued that "maintaining the class action [was] not a superior mechanism in which to proceed in this case as proper notice of the impact fee refunds would

benefit all property owners in the affected districts [in] 'that a class action seeking to compel the payment of a governmental benefit is not ripe until the [Owners] have followed the statutory procedure to receive benefits.'" The court declined the County's invitation to dismiss the action on this basis. The County appealed the December 30 order ("Appeal II"), arguing that it was error for the court to order the County to bear the expense of (1) providing class notice and (2) compiling the list of class members. The COSA reviewed the order under the collateral order rule and affirmed, reasoning that any difficulty and expense the County may face in identifying and notifying class members due to its record-keeping practices should be borne by the County. *Anne Arundel County v. Cambridge Commons,* 167 Md.App. 219, 231, 235–36, 892 A.2d 593, 600, 603 (2005), *cert. denied,* 393 Md. 242, 900 A.2d 749 (2006).

### A Final Judgment And A Third Appeal

The Circuit Court issued an order on December 15, 2006 intended to resolve all material issues and certified it as final pursuant to Maryland Rule 2–602. In its order, the court found that "impact fee refunds are due to the current owners of specified impact fee paying properties ... in the total amount of $4,719,359, subject to the addition of 5% interest to the amount of refunds due from the date of each initial fee's payment[.]" This figure included impact fees collected in 1988 through 1996. The court then directed the County to "compile the names and addresses of all current owners of refund-eligible properties within 90 days ... and that the County must issue a notice to the current owner(s) of each refund-eligible property within 120 days[.]"

The County noticed its third appeal to the COSA ("Appeal III") and the Owners noticed a cross-appeal.[6] On appeal, the

---

6. In their cross-appeal, the Owners made the following five contentions: (1) the Circuit Court improperly calculated the amount of fees available for refund by omitting fees that were expended for ineligible purposes, (2) the Owners are entitled, under another now repealed AACC provision, to an additional $10,368,000 in refunds because of the County's

County asserted, *inter alia,* that (1) the proper remedy for the County's failure to effectively extend the time for expending or encumbering transportation impact fees is a remand to the PZO to make new findings under a correct standard; (2) the Owners' claims are barred by limitations; and (3) the procedure under AACC, Section 17–11–210, by which owners must claim refunds after public notice, is superior to the ordered class action procedure, requiring the County to identify and individually notify owners entitled to a refund. The intermediate appellate court, in an unreported opinion, disagreed and affirmed the Circuit Court judgment on these issues.

We issued a writ of certiorari to consider the County's following three questions:

I. After the Circuit Court ruled that the County PZO had applied the wrong legal standard in making administrative decisions to extend the period for encumbering or expending impact fees, did the Circuit Court err by

---

failure to establish, out of general funds, a reserve account for permanent public improvements that matched impact fee revenues, (3) the Owners' refund should include investment income realized by the County on the impact fee special funds, (4) the Circuit Court misconstrued the impact fee ordinance's refund provision with respect to the time when the Owners' right to a refund arose, and (5) the Owners' counsel are entitled to the contingent fee provided by their contract with class representatives.

The Court of Special Appeals ("COSA") agreed with the Owners on the first contention and ordered that on remand, the Circuit Court should recompute the refund "to account for funds that were expended for purposes beyond the authorization of the impact fee ordinance." It rejected, however, in a subsequent clarifying opinion "the Owners' position that the refund must be increased, dollar for dollar, by the amount of the ineligible expenditures." The COSA explained that "[a]lthough the County violated its Code by expending impact fees for ineligible purposes, the violation results in a refund remedy only if the conceptually restored impact fees remained unexpended or unencumbered after six years from collection." The COSA ruled against the Owners on issues two, three, and four. It rejected, moreover, the Owners' argument "that, under all of the circumstances, the circuit court abused its discretion by awarding Counsel a fee less than the forty percent contingency fee agreed to by the named class representatives." It then directed the Circuit Court, on remand, to "consider, in light of [the COSA's opinion] and [the Circuit Court's] further findings, whether to adjust, up or down, the provisional fee to Counsel[.]"

refusing to remand this case to the PZO for new decisions under the correct standard of law on grounds that the statutory time period for making the decisions had expired and thus current property owners had vested rights in refunds totaling $4.7 million, plus interest from the date of payment?

II. Do causes of action seeking judicial review of the administrative decisions of the County PZO and Office of Finance ("FO") as to whether impact fees are available for refund accrue for purposes of the statute of limitations in [CJP Section 5–101] on the date on which the County was required by law to make the decisions, even though there is no public notice of the decisions?

III. Should this action to recover refunds of impact fees that have not been expended or encumbered in the prescribed period have been certified as a class action for damages under Maryland Rule 2–231(b)(3) even though there is a detailed administrative procedure in [Section] 17–11–210 of the County Code for making refunds that is much less difficult and costly to administer and will afford complete relief?

## DISCUSSION

### I.

### The County's Remand Request

The County contends that the courts below erred by declining to remand the case to County administrative officials for new decisions under AACC, Section 17–11–210 after ruling that the County PZO applied the wrong standard of law in granting extensions. The County asserts that the case must be remanded so that the PZO can grant extensions, validly and retroactively, by making the requisite findings that particular properties, for which fees were collected, would be benefitted directly by a planned project. The County argues that our decision in *Frankel,* 361 Md. at 307–11, 761 A.2d at 328–30 provides the analytical model for the Owners' claims in this

case. According to the County, *Frankel* compels a remand to the County PZO and FO under the settled administrative law principles that the County articulates as follows:

(1) even in the absence of a statutory provision authorizing an appeal, the Circuit Court has inherent authority to review a quasi-judicial decision of an administrative agency to determine if it was arbitrary, capricious or illegal ... and (2) once the Circuit Court determines that an agency has applied the wrong standard of law, the function of the Court is at an end and it may not substitute its judgment for that of the agency, but must remand the case for a new decision under the correct standard.

In *Frankel,* we considered whether the University of Maryland, College Park ("the University") violated a student's due process and equal protection rights by requiring him, a Maryland resident, to pay higher tuition fees than other Maryland residents for being " 'financially dependent' upon an out-of-state benefactor[.]" *Id.* at 301, 761 A.2d at 325. We concluded that the University's policy violated the student's rights under Article 24 of the Maryland Declaration of Rights because it arbitrarily and irrationally discriminated against many bona fide Maryland residents. *Id.* at 318, 761 A.2d at 334.

In the course of discussing an issue raised by the County relating to Frankel's abandonment of his right to a refund claim, we explained why a remand to the University's hearing board that made the decision to deny Frankel in-state status was appropriate:

Under the Policy and the procedures therein set forth, a student is obligated to pay the higher out-of-state tuition during the pendency of a request for re-evaluation and all appeals. *Until there is a proper re-evaluation, approval of the request, and a change in status, there would appear to be no entitlement to a credit or a refund. If, as we shall hold, the Policy provided for, and the administrative officials used, legally impermissible criteria in denying [Frankel's] request for in-state status and claim for a refund, those officials will be obligated to reconsider*

> *his request and claim using permissible criteria. A*
> *refund under the Policy cannot be made until the appro-*
> *priate officials properly rule upon [Frankel's] request for*
> *in-state status, employing legally permissible criteria.*

*Id.* at 307, 761 A.2d at 329 (emphasis added).

We added that "nothing in the Policy provid[ed] that the entitlement to a refund cease[d] immediately upon the student's graduation." *Id.* The Policy provided, in reference to a student's request for a re-evaluation of his or her residency status, that " '[i]f an approval is granted, then the Bursar's Office [would] credit the student's account for any excess tuition paid." *Id.* at 304, 761 A.2d at 327. The Policy then stated that "[t]he student may also request a refund directly from the Bursar's Office." *Id.* These alternative Policy provisions for a credit or a refund suggested that a refund was the appropriate remedy when the student was no longer enrolled at the University and thus no longer had a University account that could be credited. *Id.* at 307–08, 761 A.2d at 329. We noted, furthermore, that

> "the General Assembly has now provided broad ... refund
> remedies covering every type of tax, fee, or charge improp-
> erly collected by a Maryland governmental entity." *Bow-*
> *man v. Goad,* 348 Md. 199, 204, 703 A.2d 144, 146 (1997).
> Although one must follow the appropriate administrative
> remedy to be entitled to a refund, *Bowman v. Goad, supra,*
> 348 Md. at 204, 703 A.2d at 146, [Frankel] [had] meticulous-
> ly followed the applicable administrative procedures re-
> quired by the University.

*Id.* at 308, 726 A.2d at 329.

We observed that Maryland Code (1988, 1997 Repl.Vol., 1999 Supp.), Section 13–901(a) of the Tax General Article may be applicable when a state college or university charges a student more for tuition than is legally payable:

> That section broadly authorizes a refund claim against the
> State by a claimant who "(1) erroneously pays to the State a
> greater amount of ... fee, [or] charge ... than is properly
> and legally payable." Under § 13–1104(a), a claimant has

three years from the date of payment to file "a claim for refund under this article . . . ," and [Frankel] clearly filed his claim and brought this action within that time.

*Id.* Frankel could also maintain an action in assumpsit "if the statutory refund remedy in § § 13–901(a)(1) and 13–1104(a) of the Tax General Article [was] inapplicable to [the] case[.]" *Id.* at 308–09, 761 A.2d at 329. We explained:

The General Assembly delegated to the Board very broad authority over tuition and fees (§ 12–109(e)(7) of the Education Article), and the Board adopted a Policy and regulations entitling a student to a credit or refund of tuition upon re-classification from out-of-state status to in-state status. *It has long been settled in Maryland that when one pays to a state government agency or a local government more in taxes, fees, or charges than the government is entitled to, and when the law specifically authorizes "a refund, although no particular statutory remedy is provided," a common law contract "action . . . is available."*

*Id.* at 309, 761 A.2d at 329–30 (citation omitted, emphasis added).

The County acknowledges the rule that "where a refund of fees paid to the government is sanctioned by law, but no procedure is provided for obtaining a refund, an action in assumpsit lies against the government to obtain the refund." Yet it seizes on our analysis of the defenses asserted in *Frankel* for the proposition that an assumpsit claim is not ripe until there is a remand and administrative officials have rendered a decision according to the correct legal standard. This proposition, it argues, is consistent with settled principles of administrative law addressed in, *inter alia, Department of Natural Resources v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 334 A.2d 514 (1975) and *Belvoir Farms Homeowners Ass'n, Inc. v. North*, 355 Md. 259, 734 A.2d 227 (1999).

In *Linchester*, we considered the constitutionality of a statute, under the separation of powers doctrine, that permitted a *de novo* jury trial on the reasonableness of administrative action in granting or denying a permit to build in wetlands.

274 Md. at 214–15, 217–18, 334 A.2d at 518–20. In considering this question, we contrasted the relative role of the administrative agency with that of the judiciary and indicated that agencies perform quasi-legislative and quasi-judicial duties. *Id.* at 221–22, 334 A.2d at 521–22.

We distinguished the quasi-judicial authority of administrative agencies "from the exercising of the 'judicial powers' of this State, which by Section I, Article IV of the Maryland Constitution is reserved exclusively to designated courts" and indicated that courts have an inherent power to review administrative agency decisions:

> While administrative agencies, in the proper performance of duties which the Legislature permissibly delegates to them, may use discretion to formulate policy, promulgate rules and adjudicate in order to determine specific questions of fact, they, nevertheless, in doing so are performing nonjudicial functions; on the other hand, the role of the courts in regard to these administrative agency functions is to see that these responsibilities were properly empowered to the agency and have been performed within the confines of the traditional standards of procedural and substantive fair play. In order to perform this essential duty, the courts may be provided with specific authorization to do so by the Legislature through statutory provision, but, even absent such authority, the judiciary has an undeniable constitutionally-inherent power to review, within limits, the decisions of these administrative agencies.

*Id.* at 222–23, 334 A.2d at 522–23. "This power of review, whether authorized by statute or assumed inherently, cannot be a substitution of the court's judgment for that of the agency" and is limited to determining whether the contested quasi-judicial decision "was rendered in an illegal, arbitrary, capricious, oppressive or fraudulent manner." *Id.* at 224, 334 A.2d at 523.

In *Belvoir Farms*, we discussed the role of a reviewing court when confronted with an agency conclusion based upon an error of law. There, the Circuit Court properly

concluded that the agency applied the wrong legal standard in granting a critical area zoning variance, but erred in reversing the decision without a remand to the agency. We explained: "Generally, when an administrative agency utilizes an erroneous standard and some evidence exists, however minimal, that could be considered appropriately under the correct standard, the case should be remanded so the agency can reconsider the evidence using the correct standard." *Belvoir Farms*, 355 Md. at 270, 734 A.2d at 234. The reviewing court must remand the matter so that it will not usurp an administrative function:

> "It is a fundamental principle of administrative law that a reviewing court should not substitute its judgment for the expertise of the administrative agency from which the appeal is taken. This principle underlies the rule that if an administrative function remains to be performed after a reviewing court has determined that an administrative agency has made an error of law, the court ordinarily may not modify the agency order. Under such circumstances, the court should remand the matter to the administrative agency without modification[.] ... Finally, if an administrative function remains to be performed, a reviewing court may not modify the administrative agency's action even when a statute provides that the court may 'affirm, modify or set aside' because a court may not usurp administrative functions."

*Id.* at 268, 734 A.2d at 232 (quoting *O'Donnell v. Bassler*, 289 Md. 501, 509–11, 425 A.2d 1003, 1008 (1981) (citations, footnote omitted)).

The County's appeal to *Frankel* and general administrative law principles in arguing for a remand presumes, erroneously, that there is an administrative procedure and function that remains to be performed in this case. In *Frankel*, a remand to the University was the proper disposition because the University had an established administrative procedure for Frankel's tuition refund request:

> Under the "Procedures Established by the University of Maryland at College Park," ... residency is first deter-

mined when a student applies for admission. If a student is dissatisfied with the initial residency classification, or if circumstances subsequently change, he or she "may request a re-evaluation of his or her residency status." If the request for re-evaluation is denied, the student may appeal to the Director of the "Residency Classification Office," and finally to the "Residency Review Committee." While a request for re-evaluation and the appeals are pending, a student is "still obligated to pay the out-of-state tuition." The Policy goes on to provide that "[i]f an approval is granted, then the Bursar's Office will credit the student's account for any excess tuition paid. The student may also request a refund directly from the Bursar's Office."

*Frankel,* 361 Md. at 304, 761 A.2d at 327. The Board of Regents for the University System was empowered by statute to prescribe the policies and procedures set forth above. *Id.* at 301, 761 A.2d at 326. The University president, in turn, had a statutory authority, subject to the regulations and policies set by the Board, to set tuition and fees. *Id.* at 302, 761 A.2d at 326. Our decision left the University with an unperformed administrative function because the University, in denying the Frankel's refund request on the ground that Frankel was a financially dependent non-resident, did not fully consider Frankel's claim that he was a resident based on eight domicile factors set forth in the Policy. *Id.* at 302–03, 305, 318, 761 A.2d at 326–27, 334–35.

This case shares in common with *Frankel* the characteristic that there is an administrative agency or office empowered by statute to process refund claims. The County impact fee ordinance designates to the County FO and Controller the tasks of notifying owners of the availability of a refund and reviewing refund applications. AACC § 17–11–210(a), (b), and (c). The ordinance also designates to the County PZO the task of extending the time in which fees must be expended or encumbered. § 17–11–210(e). ***But unlike Frankel, the County is required to perform its administrative functions within a prescribed time period.*** In the absence of validly executed extensions under Section 17–11–210(e), the County

FO was required to publish notice of the availability of fee refunds within sixty days from the end of the sixth fiscal year following collection. § 17–11–210(a), (b). The ordinance then required the eligible property owners to file an application for a refund within sixty days of the last publication of notice. § 17–11–210(c).

█ The County contends that the Owners did not become vested with a right to a refund just because the PZO failed to execute a valid extension and cites a series of cases in support of its position that the Owners merely have a contingent right to a refund. It maintains that the Owners' refund rights do not vest or accrue until the County officials perform their Section 17–11–210 administrative functions on remand, such as (1) determining whether the period for expending or encumbering impact fees should be extended, (2) determining that there are fees available for a refund, and (3) publishing notice that there are fees available for refund in connection with specified districts and years.

This case is not about vesting. It is about the PZO's lack of authority under the impact fee ordinance to go back and make administrative decisions that it failed to effectively execute when permitted. Indeed, the Owners may not be vested in their right to a refund. Whether they are entitled to a refund and in what amount will be determined by the Circuit Court on remand. The full refund amount determined by the Circuit Court may be reduced if the County is able to prove that it, in fact, encumbered the impact fee funds within six years.[7] Judge Rodowsky, writing for the COSA (specially designated) in Appeal III, explained:

---

7. The Court of Special Appeals held in its May 7, 2008 unreported opinion that the Circuit Court, on remand, should re-determine the amount that the County had timely encumbered for eligible capital improvements, and in doing so, "should consider not only encumbrances for transportation projects, but for school projects as well when applying the six-year test." We did not grant certiorari as to this issue, and thus the decision of the intermediate appellate court is law in this case. Accordingly, the determination by the Circuit Court as to the amount of the refund may be modified on remand, and the Owners' rights in any specific refund award are not vested.

Here, the onus was on the County validly to extend the time before the right to refunds accrued, and the Code set a time limit for effecting that extension in the prescribed manner. This the County failed to do. There is nothing that the County can do now to correct what it failed to do by the end of the sixth year after collection of the impact fees. Once the window for effecting a valid extension closed, the right to a refund arose in all of the Owners in any district in which fees collected had not been timely expended or encumbered. *See* § 7–11–210. Under the refund format adopted by the County, all owners in districts where refunds are to be made for a given year share in the refund pro rata. There is no need for an administrator now to choose, from among properties for which impact fees had been paid, those properties which would benefit directly by a planned improvement and those that would not.

Nevertheless, although the Circuit Court may modify, on remand, the amount determined to be owing as a refund, this is not an administrative process, and there remains no administrative process to be completed.[8] Instead, the County wants to go backwards in time, and make determinations and perhaps, expenditures, that are time barred.

Section 17–11–210(d) states that the "fees collected in a district during a fiscal year ... not expended or encumbered *shall be made available for refund[.]* " (Emphasis added.) We see the County impact fee ordinance as a compromise, perhaps a politically sensitive one. The County Council could have passed an ordinance simply requiring that certain impact fees be paid when real property was developed, without any

---

**8.** As the Court of Special Appeals in Appeal I observed, the County impact fee ordinance does not provide any administrative procedure for obtaining a refund "absent an advertisement." The Owners are also unable to pursue their impact fee refund claims in the County Board of Appeals because the Board of Appeals does not have the authority to review tax matters. *See* Anne Arundel County Charter (2005), § 602(b)-(f)(authorizing the County Board of Appeals to review orders relating to zoning; licenses and permits; building; executive, administrative, and adjudicatory orders; and utility extensions).

requirement for a refund.[9] This would impose the burden for the expense of county infrastructure on property developers and ultimately those who purchased from them. Instead, the law tempers the effect of a straight non-refundable impact fee by providing for the refund. In doing so, it places a time limit on the County's retention of the impact fee before expenditure or encumbrance for one of the stated uses to benefit properties within the applicable "impact fee district." AACC § 17–11–209(d) and 210. The plain words of the ordinance make clear that the lawmakers did not intend that the County be able to utilize the impact fee revenue as a general unrestricted fund for county infrastructure for an unlimited time.

The ordinance specifically authorized a refund, absent an effective extension, at the close of the sixth fiscal year following collection. *Frankel* makes clear that, with such a law, the Owners have a remedy in assumpsit. *See* 361 Md. at 309, 761 A.2d at 329–30 (citation omitted) (stating the long-settled rule that "when one pays to a . . . local government more in . . . fees . . . than the government is entitled to, and when the law specifically authorizes 'a refund, although no particular statutory remedy is provided,' a common law contract 'action . . . is available' ").

## II.

### Whether The Owners' Claims Are Time–Barred

The County argues that the Owners' action to obtain impact fee refunds for fees collected in fiscal years 1988 through 1991 is barred by the statute of limitations set forth in Maryland Code (1974, 2006 Repl.Vol., 2008 Supp.), Section 5–101 of the Courts and Judicial Proceedings Article ("CJP"). This Sec-

---

**9.** The County, in structuring its impact fee ordinance could also have provided an administrative adjudicative body to which appeals could be taken. For example, in Queen Anne's County, appeals may be taken by any person aggrieved by a final decision of the county official that reviewed the application to the Queen Anne's County Board of Appeals. *See* Queen Anne's County Code ("QACC") (2004), § 18:3–14. An applicant's ability to file is not contingent on the publication of notice. *See* QACC § 18:3–13.

tion states that "[a] civil action at law shall be filed within three years from the date it accrues[.]'" CJP § 5–101.

In *Poffenberger v. Risser,* 290 Md. 631, 636, 431 A.2d 677, 680 (1981), we held the "discovery rule" to be "applicable generally in all actions" and under this rule, a "cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." The discovery rule does not contemplate constructive notice, a " 'creature of positive law, resting upon strictly legal presumptions which are not allowed to be controverted[.]' " *Id.* at 637, 431 A.2d at 680–81 (citation omitted). The rule, instead,

> contemplates actual knowledge—that is express cognition, or awareness implied from "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued."

*Id.* at 637, 431 A.2d at 681 (citation omitted).

" 'Under the discovery rule as stated in *Poffenberger* limitations begin to run when a claimant gains knowledge sufficient to put her on inquiry.' " *Lumsden v. Design Tech Builders, Inc.,* 358 Md. 435, 445, 749 A.2d 796, 801 (2000) (citation omitted). Being on inquiry notice "means having knowledge of circumstances which would cause a reasonable person in the position of the plaintiffs to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [cause of action]." *O'Hara v. Kovens,* 305 Md. 280, 302, 503 A.2d 1313, 1324 (1986).

The County asserts, citing *Moreland v. Aetna U.S. Health-care, Inc.,* 152 Md.App. 288, 297, 831 A.2d 1091, 1096–97 (2003), that the discovery rule applies to the discovery of facts, not the discovery of law, and that knowledge of the law is presumed. Thus, the County argues, the Owners "must be presumed to know the dates" under Section 17–11–210 of the impact fee ordinance "by which the County PZO and FO were required to make the challenged administrative decisions." [10]

---

10. The County's argument proceeds as follows:

In *Moreland*, 152 Md.App. at 291–94, 831 A.2d at 1092–94, the COSA considered whether the plaintiffs, members of an HMO, were barred by limitations from recovering funds received by a health maintenance organization ("HMO") from a tortfeasor's insurance carrier in settlement of the HMO's subrogation claim. The agreement at issue contained a clause which "purported to subrogate [the HMO] to Moreland's rights of recovery against the tortfeasor and entitle it to reimbursement ... of medical and hospital expenses it had paid for Moreland plus the cost of suit and attorneys' fees."

---

The latest dates by which the County PZO and FO were required to make the administrative decisions were established by § 17–11–210. Under § 11–17–210(b), the FO is required to determine whether there are impact fees available for refund and to give public notice of this fact within 60 days of the end of the sixth FY following the FY of collection of the fees. Further, any decision by the County PZO under § 17–11–210(e) to extend the period in which the County is required to expend or encumber impact fees must necessarily be made prior to the final date on which the County FO is required to make a decision as to whether there are fees available for refund. Accordingly, under § 17–11–210(a), (b) and (e), the latest date on which [the Owners'] claim[s] ... accrued was 60 days following the end of the sixth FY following the collection of impact fees.

The County's FY ends June 30 of each year. Thus, for impact fees collected in FY 1988, in the absence of an extension by the County PZO, the FO was required to determine whether impact fees were available for refund and, if so, publish notice, on or before August 29, 1994. Accordingly, by law, any extension by the County PZO of the period in which the County was required to expend or encumber impact fees collected in FY 1988 was required to have been made on or before August 29, 1994. The County PZO's March 21, 1994 extension decision extended the period for expending or encumbering impact fees in FYs 1988 and 1989. Thus, [the Owners'] claim[s] ... accrued no later than August 29, 1994, and is time barred because this action was not filed until February 21, 2001. Likewise, any extension decision relating to fees collected in FY 1989 was required to have been made on or before August 29, 1995. The County PZO's March 21, 1994 extension decision related to fees collected in FY 1989, and thus any claim that relates to this extension decision for FY 1989 accrued, at the latest, on August 29, 1995 and is time barred.

The County applies this reasoning for the fees collected in FYs 1988 through 1991. Applying the three-year limitations period in Maryland Code (1974, 2006 Repl.Vol., 2008 Supp.), Section 5–101 of the Courts and Judicial Proceedings Article, the County asserts that the Owners' refund claims for FYs 1988 through 1991 became time barred as of August 29 in 1997, 1998, 1999, and 2000.

*Id.* at 292, 831 A.2d at 1093. More than eight years after the HMO received its subrogation recovery, we held in *Riemer v. Columbia Medical Plan, Inc.*, 358 Md. 222, 233, 747 A.2d 677 (2000) that an HMO may not pursue its members for subrogation after the members have received a financial settlement from a third-party tortfeasor, notwithstanding any contractual provision to the contrary. *Moreland*, 152 Md.App. at 292–92, 831 A.2d at 1093. Believing this decision entitled them to recover funds the HMO had collected in its subrogation action against a tortfeasor, the members filed their action approximately a year later. *Id.* at 293, 831 A.2d at 1093–94.

The Circuit Court dismissed the *Moreland* plaintiffs' claims because their causes of action, if any, accrued on the settlement date and they did not file suit until more than three years later. The members argued to the COSA that they were not on inquiry notice of their causes of action until our decision in *Riemer* was issued and that their suit was timely because it had been filed within three years of that date. In asserting that they were not on inquiry notice as of the settlement date, the appellants maintained that "they were not aware of their legal remedies against [the HMO], even though they were aware of all of the facts that would support the remedies[.]" *Id.* at 297, 831 A.2d at 1096.

▮▮▮ The COSA rejected this argument, and held that the members "had actual knowledge of the facts necessary to assert a claim against [the HMO] for wrongfully exercising a subrogation lien." *Id.* at 298, 831 A.2d at 1096–97. As it explained, " '[k]nowledge of *facts*, ... not actual knowledge of their legal significance, starts the statute of limitations running. The discovery rule ... applies to discovery of *facts*, not to discovery of *law*. Knowledge of the law is presumed.' " *Id.* at 297–98, 831 A.2d at 1096 (quoting *Miller v. Pac. Shore Funding*, 224 F.Supp.2d 977, 986–87 (D.Md.2002)) (citations omitted). The COSA rejected the members' accrual theory because it was "premised entirely on notice of the law, not notice of facts." *Id.* at 298, 831 A.2d at 1097.

We agree that notice of facts, and not the law, is the trigger for commencement of the limitations period. The Owners were, indeed, presumed to have had knowledge of the County impact fee ordinance. But it does not follow that the Owners' presumed knowledge of the ordinance alone would prompt them to undertake an investigation that would reveal the alleged entitlement to a refund. When the County did not publish notice within the time prescribed in Section 17–10–210(b), the Owners were entitled to draw the reasonable conclusion that there were no available refunds because either (1) the collected fees had been expended or encumbered or (2) the County PZO validly extended the time for expending or encumbering fees. "There is a strong presumption that public officers properly perform their duties." *Lerch v. Maryland Port Auth.,* 240 Md. 438, 457, 214 A.2d 761, 771 (1965). *See also, e.g., In re Bennett,* 301 Md. 517, 526, 483 A.2d 1242, 1246 (1984)(applying the presumption). Because the Owners reasonably could draw this conclusion, there was no reason for them to file a Public Information Act request "seeking the precise documents and information that they requested in discovery in the present case," as the County contends they should have.[11]

The County had the burden of proving both discovery rule components—the Owners' knowledge of facts sufficient to prompt investigation and that a diligent investigation would have revealed their cause of action. *See Pennwalt Corp. v. Nasios,* 314 Md. 433, 449, 550 A.2d 1155, 1163–64 (1988). The County did not, however, offer any evidence, other than a presumed knowledge of the impact fee ordinance, that the Owners were aware of facts that would prompt an earlier inquiry.[12] Accordingly, we conclude that the Circuit Court did

---

11. It asserts that these documents "included, among others, the extension decisions of the PZO, impact fee reconciliation reports, job cost appropriation statements, proposed Capital Budgets, and appropriation ordinances."

12. The County asserted its statute of limitations defense in a motion for summary judgment. In denying the County's motion on October 23,

not err in ordering that refunds are due for fees collected in 1988 through 1991.

## III.

## The Propriety Of Class Action Certification

The last issue is whether the Circuit Court erred in certifying a class action under Maryland Rule 2–231(b)(3), thereby denying the County the ability to provide refunds by publishing notice and reviewing applications pursuant to Section 17–11–210 of the impact fee ordinance. Maryland Rule 2–231 provides that any class action lawsuit, in addition to meeting certain prerequisites set out in 2–231(a), must satisfy the requirements of one of the three statutory categories of 2–231(b). In this case, the class was certified under 2–231(b)(3), which has the following requirements:

(b) **Class actions maintainable.** Unless justice requires otherwise, an action may be maintained as a class action if the prerequisites of section (a) are satisfied, and in addition:

\* \* \*

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the·findings include: (A) the interest of members of

---

2003, the Circuit Court found that "it exceeds a 'reasonable person' standard to require that taxpayers initiate public records requests promptly whenever a statutory deadline approaches that might entitled them to a refund." It reasoned that the Owners were entitled to presume that the County officials performed their functions regularly and resolved that in the absence of the County's provision of public notice, the Owners were entitled to reasonably presume that there were no such funds available. The Circuit Court then concluded that "[i]n the absence of any other evidence proffered which would have put [the Owners] on notice, this Court will deny the motion for summary judgment on this limitation basis."

the class in individually controlling the prosecution or defense of separate actions, (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, (D) the difficulties likely to be encountered in the management of a class action.

In its order, the Circuit Court found that " 'the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy[.]' " It then made the following findings regarding the Rule 2–231(b)(3) factors to determine "whether common issues of law or fact predominate":

> As for the first factor, the Court will reiterate its findings as to the commonality of the putative class plaintiffs' claims. If they are successful, all plaintiffs will be entitled to the same relief. The only differences between the plaintiffs will be based on the fees paid on the properties they now own and the amount of funds, if any, available for refund in their respective school and transportation districts. The second and third factors are also easily dismissed. Neither side has presented any evidence that there is any related litigation that has already commenced. Also, all of the alleged injuries occurred in Anne Arundel County; clearly, this Court would be the proper forum for the claims of any of the putative class members. Finally, as to the fourth factor, this Court can find no reason why the difficulties encountered in the present class action suit would be any different from those encountered in any other class action suit.

The County takes issue with the Circuit Court's class certification, asserting it did not analyze whether a class action member identification and personal notification procedure is superior to the impact fee ordinance's administrative refund procedure for the fair and efficient adjudication of the contro-

versy.[13] The County points to the administrative burden it will face in complying with the class member identification and individual notice requirements of a class action lawsuit. To provide notice to each potential class member, it claims, County employees will have to manually review microfiche building records to construct a computer database containing property tax account numbers for the properties on which impact fees were paid. The County will then have to compare this property-specific data with information in a separate property tax database containing the names of the current owners for each fee-owed property. The County estimates that the process will require over 900 hours of employee time, and argues that this burden should preclude the Circuit Court's finding that a class action was a mechanism superior to the administrative process set forth in the impact fee ordinance.

The County views the newspaper publication notice procedure under the impact fee ordinance as superior because it has maintained records sufficient to allow it to respond, quickly and effectively, to refund applications submitted in response to this form of notice. It explains:

> [T]he [State Department of Assessments and Taxation] property tax account number for properties is shown on the [Permit Information Processing System] building permit record. Thus, when the County receives a refund application with a property tax account number, it can readily search for this number and determine whether the applicant is entitled to a refund because an impact fee was paid on the properly in the relevant FY. In short, the County has maintained records that are fashioned to permit it to comply with [Section] 17–11–210 by responding to applications, and has not maintained records that allow it to readily identify all current owners of properties who are entitled to a refund. Thus, not only is a class action for damages not superior to the available administrative remedy, a class

---

**13.** The County does not contest that common questions of law or fact predominate.

action is unnecessary because the relief that can be granted through the established administrative process will, by definition, apply to and benefit all property owners in the affected districts.

Our holding in Part I that the impact fee ordinance leaves the Owners with no administrative procedure to obtain a refund undermines the central tenet of the County's argument. Moreover, there are additional reasons justifying the Circuit Court's Rule 2–231(b)(3) class certification, which we address below.

"We ordinarily review a [Circuit Court's] decision regarding whether to certify a class action for an abuse of discretion." *Creveling v. Gov't Employees Ins. Co.*, 376 Md. 72, 90, 828 A.2d 229, 239 (2003). "[T]he basis of the certification inquiry is essentially a factual one, and thus, deference is due." *Id.*, 828 A.2d at 240. Our standard of review for determining whether a Circuit Court used a correct legal standard in determining whether to grant or deny class certification is *de novo*. *Philip Morris, Inc. v. Angeletti*, 358 Md. 689, 726, 752 A.2d 200, 220 (2000).

In *Angeletti*, we gave an in-depth explanation of the appropriate "superiority" analysis for a 2–231(b)(3) class certification and analyzed each of the four specified factors with the guidance of cases applying the corresponding federal rule. 358 Md. at 762–69, 752 A.2d at 240–44. Regarding the first Rule 2–231(b)(3) factor, "the interest[ ] of members of [the] class in individually controlling the prosecution or defense of separate actions," we observed that this factor protects " 'traditional notions of an individual's jurisprudential rights.' " *Id.* at 763, 752 A.2d at 240–41 (citation omitted). There is no indication in this case that current property owners will lose some benefit if unable to individually prosecute their cases. The issue on remand is whether the County timely encumbered fees—a shared burden of proof for all potential refund claimants. Litigation of this issue does not involve a wide range of strategy and tactics that might favor the maintenance of separate suits. *Cf., e.g., Causey v. Pan Am. World Air-*

*ways, Inc.*, 66 F.R.D. 392, 398–99 (E.D.Va.1975)(declining class certification due to the varying mass-accident plaintiffs' citizenships and resulting conflicts of law questions as to the plaintiff's burden of proof, the use of certain defenses, and the availability of some theories of recovery). This is not a case, moreover, in which there are potentially divergent forms of relief available. *Cf., e.g., Crasto v. Estate of Kaskel*, 63 F.R.D. 18, 24 (S.D.N.Y.1974)(declining class certification when some shareholder plaintiffs in a co-operative apartment building may prefer to move out and collect damages whereas others may prefer an amicable agreement and remain in their homes). Once the court determines the overall amount of fees available for refund, each individual owner's share will be identifiable from County records.

 The second factor focuses on "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class[.]" Md. Rule 2–231(b)(3)(B). This evaluation is " 'aimed at determining whether there is so much pre-existing litigation that a class would be unproductive' " and " 'is intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits.' " *Angeletti*, 358 Md. at 764, 752 A.2d at 241 (citations omitted). Here, there is no other pending litigation for refunds under the impact fee ordinance, and no corresponding concerns over judicial economy or multiple lawsuits.

Under Rule 2–231(b)(3)(C), courts should consider "the desirability or undesirability of concentrating the litigation of the claims in the particular forum[.]" In *Angeletti*, we cited with approval the following explanation:

"This factor embodies basically two considerations. First, a court must evaluate whether allowing a Rule [2–231(b)(3) ] action to proceed will prevent the duplication of effort and the possibility of inconsistent results. . . .

The other consideration . . . is whether the forum chosen for the class action represents an appropriate place to settle the controversy, given the location of the interested parties,

the availability of witnesses and evidence, and the condition of the court's calendar."

358 Md. at 764–65, 752 A.2d at 241 (quoting 7A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1780, at 572–73 (2d ed.1986)). In this case, the Circuit Court for Anne Arundel County is an able and appropriate forum. It will provide consistent results and is located near all potential class members in Anne Arundel County.

The final factor looks to any "difficulties likely to be encountered in the management of a class action." Md. Rule 2–231(b)(3)(D). This factor " 'encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit.' " *Angeletti*, 358 Md. at 765, 752 A.2d at 242 (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164, 94 S.Ct. 2140, 2146, 40 L.Ed.2d 732 (1974)). Federal courts have denied class-certification under this factor for concerns due to individualized and exceedingly complex factual or legal programs. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191 (3rd Cir.2001)(finding unmanageable class action which would require individualized inquiry into "hundreds of millions" NAS-DAQ transactions); *Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir.1996)(denying as unmanageable a class action against "1–900" marketing schemes which would require state law-specific inquiries for plaintiffs from all 50 states); *Emig v. American Tobacco Co., Inc.*, 184 F.R.D. 379, 393 (D.Kan.1998)(ruling that plaintiffs' proposed trifurcated trial plan was unmanageable because it "would necessarily require some type of individual trial for every class member and would greatly complicate the management of the class action").

■ The County would include a class action defendant's administrative difficulty as one of the practical problems that can make a class action unmanageable. We are unconvinced, however, that the County's burden makes this class action unmanageable and thus not superior. The Circuit Court's

determination of the fees available for refund, though complicated, has not required, nor will require in its reconsideration on remand, an extensive, individualized, refund inquiry for each class member. As we explained in footnote seven, the Circuit Court's task on remand will only require that the court determine whether and how much refund is owed, in total, after considering all impact fee amounts that the County had timely encumbered for eligible capital improvements, including payments or encumbrances for both transportation projects and school projects. This remaining step, though requiring an initially burdensome notice procedure, is not comparable to other complex, furcated, trial procedures for which a class action has been denied. Although the burden on a defendant is certainly considered, the County fails to cite any other case in which a class certification was denied because of a burden on the defendant comparable to that claimed here.

In *Pattillo v. Schlesinger*, 625 F.2d 262, 264–65 (9th Cir. 1980), a case relied on by the County, the United States Court of Appeals for the Ninth Circuit denied class certification on the basis that the administrative procedure was superior for the plaintiff, not more convenient for the defendant. The proposed class in *Pattillo* was uniformed military personal who had not received payments from the military. The administrative process for getting this pay was functioning and reliable, however, and "the speed and amount of recovery would [actually] be increased by opting out of the class and filing a separate claim directly with the particular branch of the uniformed services with which the class member had served." 625 F.2d at 265. The County cannot seriously contend that its proposed alternative—publishing notice in a newspaper and waiting for applications—would enhance the ability of class members to get a refund.

The decision in *Ferguson v. Housing Authority of Middlesboro*, 499 F.Supp. 334 (E.D.Ky.1980) also does not support the County's argument. In *Ferguson*, plaintiffs challenged an eviction process by a local housing authority, and attempted to certify a class of tenants who had not yet been evicted. The Court found that class certification was unnecessary, reason-

ing that if the Court determined that the housing authority must change its eviction procedure, its ruling would automatically provide a pre-emptive remedy for the potential class member tenants. *Id.* at 335. By contrast, here, there will be no automatic remedy for proposed class members. Rather, the County's proposed alternative would render unlikely any recovery by most class members.

Given this probability, the County's burden is a secondary consideration in the "superiority" analysis. Because the refund is owed to current owners of the properties, the class members, for the most part, would not be the owners who paid impact fees, in some cases, nearly twenty years ago. Thus, these owners would have little reason to attach any significance to a public notice. Even property owners who actually paid the fee have only a small likelihood that they would see the notification, remember paying an impact fee, and respond in time for a refund. The superiority required by the statute is not "superior administrative convenience" exclusively for the defendant, but superiority "for the fair and efficient adjudication" of the matter. Adopting a method in which so few deserving property owners would receive refunds, however convenient it may be for the County, is not fair.[11]

The class certification here is also distinguishable from the class certification we denied in *Hooks v. Comptroller,* 265 Md. 380, 289 A.2d 332 (1972). In *Hooks,* a taxicab lessee taxpayer asserted his right to bring a class action for refunds of sales tax on behalf of other similarly situated taxpaying taxicab drivers. The refund process in *Hooks,* however, was controlled by the Retail Sales Tax Act, which required that an application and appeal be made by the person who paid the tax:

---

14. We draw this conclusion, even while recognizing that the ordinance only required notice by newspaper publication. The up-to-thirteen-year delay by the County in refunding fees impairs the effectiveness of a notice by publication.

It would seem patently clear that applications for refund may be made only by the taxpayer who paid the tax or by a vendor who has collected the tax from others. Here, it was the taxpayer, Hooks, who made the claim, and while he may act in his own behalf, there is no warrant in the Act permitting him to advance a claim in behalf of others similarly situated.

The right of appeal to the Maryland Tax Court provided for by § 352 of the Act is accorded "any taxpayer" and "taxpayer," as defined by § 324(q) ". . . means any person required . . . to pay or pay over to the Comptroller the tax imposed[.]" While the definition of "person" appearing in § 324(a) encompasses a person acting in a fiduciary or representative capacity, or a "group . . . of individuals acting as a unit," the definition must be read in the context of § 348, which provides that application must be made by the person who paid the tax.

*Id.* at 383–84, 289 A.2d at 334.

A second reason the *Hooks* Court assigned for denying the class action focused on the nature of a Maryland Tax Court appeal: "Additionally, it is quite clear that Maryland Rule 209, dealing with class actions, on which Hooks relies, while made applicable to the courts of the State by Rule 1, is not applicable to either the Comptroller or the Maryland Tax Court under Rule 5 i." *Hooks,* 265 Md. at 384, 289 A.2d at 334.

In contrast, the proper forum for the Owners' cause of action in assumpsit is the Circuit Court, not the Tax Court. Unlike the Tax Court, circuit courts are the correct forum for Rule 2-231 class actions. Quite simply, the *Hooks* rationale does not apply here.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.**